# Exhibit A

Pl. App.0001

Pl. App.0002

Dear Insured:

Congratulations on purchasing CyberEdge®. We look forward to providing your company with the insurance coverage and access to tools that will help you to prepare for, prevent, and control cyber risk.

As an eligible CyberEdge policyholder, you have access to the value-added loss-control services, CyberEdge RiskTool, AutoShun®, and an IBM infrastructure vulnerability scan. Together, the custom portal, hardware device and IBM vulnerability scan can help your organization stay ahead of the curve by managing and automating risk mitigation.

- CyberEdge RiskTool, provided by RiskAnalytics, a leader in cyber-risk management, is a web-based platform that helps to streamline the risk management process. The platform's content is highly customizable and can be tailored specifically to meet a number of risk management needs. With security best-practices, pre-populated training modules and more, CyberEdge RiskTool can assist in a compliance initiative, educating employees on regulatory requirements, or training staff on security protocols to help prevent human error from causing a future breach.

- AutoShun®, provided by RiskAnalytics, is a simple proactive way of improving your company's security through a hardware device. Operating in real-time, AutoShun stops an attack by blocking inbound and outbound communication with known "bad" IP addresses, thus keeping them out of your network. The device then sends the attack information to the accompanying CyberEdge RiskTool account where the dashboard updates in real-time and outlines the known "bad" IP addresses that have been shunned.

- The IBM vulnerability scan is a remote search of the Named Entity's web-facing external infrastructure, including up to 49 public-facing IP addresses.  The scan identifies and prioritizes potential vulnerabilities that could be exploited by a remote hacker and provides the Named Entity with a report which identifies threats and suggests responses.

These tools are available, at no additional cost, to eligible CyberEdge policyholders. Go to www.aig.com/cyberedgeregistration to register and enter your contact information and policy number. A representative from Risk Analytics will contact you within five business days with additional instructions.

Your decision to purchase coverage through AIG has provided your organization with powerful advantages in managing your business. We thank you for choosing AIG and look forward to a continuing successful relationship. If you have any questions or would like additional information, please contact your broker, an AIG representative or email us at mailto:CyberEdge@aig.com.

Sincerely,

Greg Vernaci
Head of Cyber, US & Canada
Greg.Vernaci@aig.com

INSERT DISCLAIMER. All products are written by insurance company subsidiaries or affiliates of AIG. Coverage may not be available in all jurisdictions and is subject to actual policy language. Non-insurance products and services may be provided by independent third parties. Certain coverage may be provided by a surplus lines insurer. Surplus lines insurers do not generally participate in state guaranty funds and insureds are therefore not protected by such funds.

Pl. App.0003

## POLICYHOLDER NOTICE

Thank you for purchasing insurance from a member company of American International Group, Inc. (AIG). The AIG member companies generally pay compensation to brokers and independent agents, and may have paid compensation in connection with your policy. You can review and obtain information about the nature and range of compensation paid by AIG member companies to brokers and independent agents in the United States by visiting our website at www.aig.com/producercompensation or by calling 1-800-706-3102.

Pl. App.0004

91222 (4/13)





Financial Lines
CyberEdge

# eRisk Hub®

When a breach event occurs, time is of the essence. Having a breach response plan in place with access to the third-party resources you need can help you efficiently and cost-effectively respond to and recover from the breach.

As a CyberEdge® policyholder, you will receive complimentary access to the eRisk Hub® portal, powered by NetDiligence®. eRisk Hub provides tools and resources to help you understand your exposures, establish a response plan and minimize the effects of a breach on your organization.

Key Features of the eRisk Hub Portal

- **Incident Roadmap:** includes suggested steps to take following a network or data breach incident, free consultation with a Breach Coach® and access to a breach response team

- **News Center:** cyber risk stories, security and compliance blogs, security news, risk management events and helpful industry links

- **Learning Center:** best-practices articles, white papers and webinars from leading technical and legal practitioners

- **Risk Manager Tools:** assists you in managing your cyber risk including a self-assessment and state breach notification laws

- **eRisk Resources:** a directory to quickly find external resources with expertise in pre- and post-breach disciplines

The eRisk Hub portal is an effective way to help your organization combat cyber losses with minimal, controlled and predictable costs.

---

To learn more about eRisk Hub portal and CyberEdge:

E-mail:                          Visit:                                      Contact:
CyberEdge@aig.com    www.aig.com/us/CyberEdge    Your insurance broker

American International Group, Inc. (AIG) is a leading international insurance organization serving customers in more than 130 countries and jurisdictions. AIG companies serve commercial, institutional, and individual customers through one of the most extensive worldwide property-casualty networks of any insurer. In addition, AIG companies are leading providers of life insurance and retirement services in the United States. AIG common stock is listed on the New York Stock Exchange and the Tokyo Stock Exchange.

AIG is the marketing name for the worldwide property-casualty, life and retirement, and general insurance operations of American International Group, Inc. For additional information, please visit our website at www.aig.com. Products and services are written or provided by subsidiaries or affiliates of American International Group, Inc. Not all products and services are available in every jurisdiction, and insurance coverage is governed by actual policy language. Certain products and services may be provided by independent third parties. Insurance products may be distributed through affiliated or unaffiliated entities. Certain property-casualty coverages may be provided by a surplus lines insurer. Surplus lines insurers do not generally participate in state guaranty funds and insureds are therefore not protected by such funds.

Pl. App.0005

02/13



**Illinois National Insurance Company**
A capital stock company

# Specialty Risk Protector®

POLICY NUMBER: 01-424-32-51   REPLACEMENT OF POLICY NUMBER: 01-346-39-91

## DECLARATIONS

### NOTICES

THIS POLICY CONTAINS ONE OR MORE COVERAGE SECTIONS. CERTAIN COVERAGE SECTIONS ARE LIMITED TO LIABILITY FOR CLAIMS THAT ARE FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER AS REQUIRED BY THE TERMS OF THE POLICY. DEFENSE COSTS SHALL REDUCE THE APPLICABLE LIMITS OF LIABILITY AND SUBLIMITS OF LIABILITY AND ARE SUBJECT TO APPLICABLE RETENTIONS.

PLEASE READ THIS POLICY CAREFULLY AND REVIEW IT WITH YOUR INSURANCE AGENT OR BROKER.

| ITEMS | | | |
|---|---|---|---|
| 1 | NAMED ENTITY | Named Entity | SOUTHWEST AIRLINES CO. |
| | | Mailing Address | 2702 LOVE FIELD DRIVE DALLAS, TX 75235 |
| 2 | POLICY PERIOD | Inception Date | June 1, 2016 | Expiration Date | June 1, 2017 |
| | | 12:01 A.M. at the address stated in Item 1 | |
| 3 | PREMIUM | $475,000 | |

4 | NAME AND ADDRESS OF INSURER

Illinois National Insurance Company
175 Water Street
New York, NY 10038-4969

This Policy is issued only by the insurance company indicated in this Item 4.

5 | LIMIT OF LIABILITY | $10,000,000

6 | COVERAGE SUMMARY

| COVERAGE SECTION | | SUBLIMIT OF LIABILITY | RETENTION | RETROACTIVE DATE | CONTINUITY DATE |
|---|---|---|---|---|---|
| MC | Media Content Insurance | $10,000,000 | $2,500,000 | March 31, 2014 | March 31, 2014 |

*1504662*

**Pl. App.0006**

101012 (12/13)   1   ® All rights reserved.

| | | | | | |
|---|---|---|---|---|---|
| S&P | Security and Privacy Liability Insurance | $10,000,000 | $2,500,000 | March 31, 2012 | March 31, 2014 |
| | Regulatory Action Sublimit of Liability | $10,000,000 | | | |
| NI | Network Interruption Insurance | $10,000,000 | $2,500,000 | Not Applicable | March 31, 2014 |
| | Waiting Hours Period | 12 hours | | | |
| EM | Event Management Insurance | $10,000,000 | $2,500,000 | Not Applicable | March 31, 2014 |
| CE | Cyber Extortion Insurance | $10,000,000 | $2,500,000 | Not Applicable | March 31, 2014 |

PRODUCER: *WOODRUFF-SAWYER & CO*
ADDRESS:   *50 CALIFORNIA STREET*
                  *FLOOR 12*
                  *SAN FRANCISCO, CA 94111*

**IN WITNESS WHEREOF,** the **Insurer** has caused this Policy to be signed by its President, Secretary and its duly Authorized Representative.

_____
PRESIDENT

_____
SECRETARY

This Policy shall not be valid unless signed below at the time of issuance by an authorized representative of the **Insurer**.

_____
AUTHORIZED REPRESENTATIVE

_____        _____        _____
COUNTERSIGNATURE                    DATE            COUNTERSIGNED AT

*1504662*

Pl. App.0007

101012 (12/13)                    2                    © All rights reserved.



**Specialty Risk Protector®**

**GENERAL TERMS AND CONDITIONS
("GENERAL TERMS AND CONDITIONS")**

In consideration of the payment of the premium, and in reliance upon the statements made to the **Insurer** by **Application**, the **Insurer** agrees as follows:

**1. TERMS AND CONDITIONS**

These **General Terms and Conditions** shall be applicable to all **Coverage Sections**. Terms appearing in bold in these **General Terms and Conditions** and not defined in Clause 2. **DEFINITIONS** of these **General Terms and Conditions** shall have the meaning provided for such terms in any applicable **Coverage Section** for purposes of coverage provided under such **Coverage Section**. The terms and conditions set forth in a **Coverage Section** shall only apply to that particular **Coverage Section** and shall in no way be construed to apply to any other **Coverage Section** of this policy.

**2. DEFINITIONS**

(a) **"Application"** means each and every signed application, any attachments to such applications, other materials submitted therewith or incorporated therein and any other statements, information, representations of any **Insured** or documents submitted by any **Insured** in connection with the underwriting of this policy or the underwriting of any other policy providing the same or similar coverage issued by the **Insurer**, or any of its affiliates, of which this policy is in whole or part a renewal or replacement or which it succeeds in time.

With respect to publicly held companies, **Application** shall also include each and every public filing by or on behalf of any **Insured** made with the SEC including, but not limited to, any **Company's** Annual Report(s), 10-Ks, 10-Qs, 8-Ks and proxy statements, any financial information in such filings, and any certifications relating to the accuracy of the foregoing, provided that such public filing was filed during the period of time:

(i) beginning at the start of the twelve (12) month period immediately preceding the first submission to the **Insurer** in connection with the underwriting of this policy; and
(ii) ending at the inception of the **Policy Period**.

(b) **"Claims-Made and Reported Coverage Section"** means any **Coverage Section** designated as such.

(c) **"Company"** means the **Named Entity** and any **Subsidiary** thereof.

(d) **"Continuity Date"** means the date set forth in Item 6 of the Declarations with respect to each **Coverage Section**.

(e) **"Control Group"** means a **Company's** Chief Executive Officer, Chief Financial Officer, Chief Security Officer, Chief Technology Officer, Chief Information Officer, Risk Manager and

<span style="color:red">Pl. App.0008</span>

101013 (12/13)                    Page 1 of 10              © All rights reserved.

General Counsel (or equivalent positions, regardless of title).

(f) **"Coverage Section"** means each **Coverage Section** that is purchased by the **Named Entity** as indicated in Item 6 of the Declarations.

(g) **"Discovery Coverage Section"** means any **Coverage Section** designated as such.

(h) **"Discovery Period"** means any **Automatic Discovery Period** or **Optional Discovery Period**, as such terms are defined in Clause 9. of these **General Terms and Conditions**.

(i) **"Domestic Partner"** means any natural person legally recognized as a domestic or civil union partner under: (i) the provisions of any applicable federal, state or local law; or (ii) the provisions of any formal program established by a **Company**.

(j) **"First Party Coverage Section"** means any **Coverage Section** designated as such.

(k) **"First Party Event"** means the event(s) or circumstance(s) contained in the definition of **First Party Event** in a **First Party Coverage Section**.

(l) **"Insurer"** means the insurance company indicated in the Declarations.

(m) **"Limit of Liability"** means the amount stated in Item 5 of the Declarations.

(n) **"Management Control"** means: (i) owning interests representing more than fifty percent (50%) of the voting, appointment or designation power for the selection of a majority of: the board of directors of a corporation, the management committee members of a joint venture or partnership, or the members of the management board of a limited liability company; or (ii) having the right, pursuant to written contract or the by-laws, charter, operating agreement or similar documents of a **Company**, to elect, appoint or designate a majority of: the board of directors of a corporation, the management committee of a joint venture or partnership, or the management board of a limited liability company.

(o) **"Named Entity"** means the entity listed in Item 1 of the Declarations.

(p) **"Occurrence Coverage Section"** means any **Coverage Section** designated as such.

(q) **"Policy Period"** means the period of time from the inception date stated in Item 2 of the Declarations to the earlier of the expiration date stated in Item 2 of the Declarations or the effective date of cancellation of this policy.

(r) **"Related Acts"** means all **First Party Events** and **Third Party Events** which are the same, related or continuous and all **First Party Events** and **Third Party Events** which arise from a common nucleus of facts. All **Related Acts** shall be considered to have occurred at the time the first such **Related Act** occurred.

(s) **"Retroactive Date"** means the date set forth in Item 6 of the Declarations as such for each **Coverage Section**.

(t) **"Sublimit of Liability"** means the applicable amount, if any, stated in Item 6 of the Declarations as such for each **Coverage Section**.

101013 (12/13)  Page 2 of 16  © All rights reserved.

Pl. App 0009

GENERAL TERMS AND CONDITIONS

(u) "**Subsidiary**" means:

   (1) any for-profit entity of which the **Named Entity** has or had **Management Control** ("**Controlled Entity**") on or before the inception date of the **Policy Period**, either directly or indirectly through one or more other **Controlled Entities**;

   (2) any for-profit entity of which the **Named Entity** acquires **Management Control** during the **Policy Period**, either directly or indirectly, whose gross revenues for the most recent fiscal year prior to the inception of this policy do not exceed ten percent (10%) of the aggregate gross revenues of the **Companies** for the most recent fiscal year prior to the inception date of this policy;

   (3) any for-profit entity of which the **Named Entity** acquires **Management Control** during the **Policy Period**, either directly or indirectly, whose gross revenues for the most recent fiscal year prior to the inception of this policy exceed ten percent (10%) of the aggregate gross revenues of the **Companies** for the most recent fiscal year prior to the inception date of this policy, but only once (a) the **Named Entity** shall have provided the **Insurer** with full particulars of such entity and agreed to any additional premium and amendments to this policy relating to such entity; and (b) the **Insurer** has ratified its acceptance of such entity as a **Subsidiary** by endorsement to this policy; and

   (4) any not-for-profit entity sponsored exclusively by a **Company**.

Notwithstanding the foregoing, coverage afforded under this policy shall only apply to **Loss** arising out of **First Party Events** and **Third Party Events** occurring or allegedly occurring after the effective time that the **Named Entity** obtained **Management Control** of such **Subsidiary** and prior to the time that such **Named Entity** ceased to have **Management Control** of such **Subsidiary**.

(v) "**Third Party Event**" means the event(s) or circumstance(s) contained in the definition of **Third Party Event** in a **Third Party Coverage Section**.

(w) "**Third Party Coverage Section**" means any **Coverage Section** designated as such.

## 3. EXTENSIONS

Subject otherwise to the terms hereof, this policy shall cover **Loss** arising from any **Claim** made against (i) the estates, heirs, or legal representatives of deceased natural person **Insureds**, and the legal representatives of natural person **Insureds** in the event of incompetency, insolvency or bankruptcy, who were **Insureds** at the time the **Third Party Events** upon which such **Claims** are based occurred; or (ii) the lawful spouse (whether such status is derived by reason of statutory law, common law or otherwise of any applicable jurisdiction in the world) or **Domestic Partner** of a natural person **Insured** for all **Claims** arising solely out of his or her status as the spouse or **Domestic Partner** of a natural person **Insured**, including a **Claim** that seeks damages recoverable from marital community property, property jointly held by the natural person **Insured** and the spouse or **Domestic Partner**, or property transferred from the natural person **Insured** to the spouse or **Domestic Partner**; provided, however, that this extension shall not afford coverage for any **Claim** for any actual or alleged **Third Party Event** committed by or directly involving the spouse or **Domestic Partner**, but shall apply only to **Claims** arising out of any actual or alleged **Third Party**

Pl. App.0010

**Event** committed by or directly involving a natural person **Insured**, subject to the policy's terms, conditions and exclusions.

**4. LIMIT OF LIABILITY**

The **Limit of Liability** is the **Insurer's** maximum liability for all **Loss** under all **Coverage Sections** combined and the **Insurer** shall not be responsible to pay any **Loss** upon exhaustion of the **Limit of Liability.**

If a **Sublimit of Liability** is stated in Item 6 of the Declarations with respect to a **Coverage Section**, then such **Sublimit of Liability** shall be the **Insurer's** maximum liability for all **Loss** with respect to such **Coverage Section** and the **Insurer** shall not be responsible to pay any **Loss** under such **Coverage Section** upon exhaustion of such **Sublimit of Liability.** Each **Sublimit of Liability** shall be part of and not in addition to the **Limit of Liability** and shall in no way serve to increase the **Limit of Liability.**

The **Limit of Liability** and any applicable **Sublimits of Liability** for any **Discovery Period** shall be part of, and not in addition to, the **Limit of Liability** and the corresponding **Sublimits of Liability** for the **Policy Period.**

Solely with respect to any **Claims-Made and Reported Coverage Sections**, a **Claim** which is made subsequent to the **Policy Period** or **Discovery Period** pursuant to Clauses 6(b) and 6(c) respectively, which is considered made during the **Policy Period** or **Discovery Period** shall also be subject to the **Limit of Liability** and any applicable **Sublimit of Liability.**

**5. RETENTION**

The **Insurer** shall only be liable for the amount of **Loss** arising from each **Claim** or **First Party Event** that exceeds the Retention stated in Item 6 of the Declarations as applicable to the **Coverage Section** affording coverage to such **Claim** or **First Party Event.** Such Retention amounts must be borne by the **Insureds** and remain uninsured.

(a) For **Third Party Coverage Sections**

If a **Claim** triggers more than one **Third Party Coverage Section**, the highest applicable Retention amount shall apply to such **Claim.**

A single Retention amount shall apply to all **Claims** alleging **Related Acts.**

(b) For **First Party Coverage Sections**

If a **First Party Event** triggers more than one **First Party Coverage Section**, all applicable Retention amounts shall apply to such **First Party Event.**
A separate Retention amount shall apply to each respective **First Party Coverage Section** for **First Party Events** involving **Related Acts.**

(c) For **First Party Coverage Sections** and **Third Party Coverage Sections**

If a **First Party Event** or a **Third Party Event** and any **Related Acts** trigger coverage under one or

101013 (12/13)    Page 4 of 18    © All rights reserved.

Pl. App. 0011

GENERAL TERMS AND CONDITIONS

more **First Party Coverage Sections** and one or more **Third Party Coverage Sections**, all **First Party Coverage Section** Retentions shall apply pursuant to (b) above, in addition to the applicable **Third Party Coverage Section** Retention pursuant to (a) above.

6. **NOTICE**

(a) The **Insureds** shall, as a condition precedent to the obligations of the **Insurer** under this policy, give written notice to the **Insurer** of any **Claim** made against an **Insured** or a **First Party Event** as soon as practicable after:

    (1) any personnel in the office of any member of the **Control Group** first becomes aware of the **Claim**; or

    (2) any **First Party Event** commences or, solely with respect to a **Discovery Coverage Section**, is discovered.

Notwithstanding the foregoing and regardless of whether any personnel described in (1) above has become aware, in all events each **Claim** under a **Claims-Made and Reported Coverage Section** must be reported no later than either:

(1) forty-five (45) days after the end of the **Policy Period**; or
(2) the end of any applicable **Discovery Period**.

(b) If written notice of a **Claim** or a **First Party Event** has been given to the **Insurer** pursuant to Clause (a) above, then:

    (1) any subsequent **Claim** made against an **Insured**; or
    (2) any subsequent **First Party Event**;

arising out of, based upon or attributable to the facts giving rise to such **Claim** or **First Party Event** for which such notice has been given, or alleging any **Related Act** thereto, shall be considered made at the time such notice was given; and

(c) Solely with respect to any **Claims-Made and Reported Coverage Section**, if during the **Policy Period** or during the **Discovery Period** (if applicable), an **Insured** shall become aware of any circumstances which may reasonably be expected to give rise to a **Claim** being made against an **Insured** and shall choose to give written notice to the **Insurer** of such circumstances, the **Third Party Events**, allegations anticipated and the reasons for anticipating such a **Claim**, with full particulars as to dates, persons and entities involved, then any **Claim** which is subsequently made against an **Insured** and reported to the **Insurer** alleging, arising out of, based upon or attributable to such circumstances or alleging any **Related Act** to that alleged or contained in such circumstances, shall be considered made at the time such notice of such circumstances was given.

(d) Notice as described herein shall be given in writing to the **Insurer** at the following address or email address:

**Pl. App.0012**

101013 (12/13)
GENERAL TERMS AND CONDITIONS

Page 5 of 10

&#9671; All rights reserved.

**AIG Property Casualty**
**Financial Lines Claims**
**P.O. Box 25947**
**Shawnee Mission, KS  66225**
**c-claim@aig.com**

Any notice must reference the Policy Number set forth in the Declarations and the **Coverage Section(s)** under which an **Insured** is providing notice.

If mailed or transmitted by electronic mail, the date of such mailing or transmission shall constitute the date that such notice was given and proof of mailing or transmission shall be sufficient proof of notice.

7. **INSURED'S OBLIGATIONS**

In connection with all **Claims** and **First Party Events** under this policy, each **Insured** agrees to the following:

(a) such **Insured** shall send the **Insurer** copies of all demands, suit papers, other related legal documents and invoices for **Defense Costs** received by such **Insured**, as soon as practicable;

(b) such **Insured** shall immediately record the specifics of any **Claim** and **First Party Event** and the date such **Insured** first received such **Claim** or **First Party Event**;

(c) such **Insured** shall cooperate with and help the **Insurer** and/or any counsel appointed pursuant to the terms of this policy, including, without limitation, as follows:

(1) by not admitting liability;
(2) in making settlements;
(3) in enforcing any legal rights any **Insured** may have against anyone who may be liable to any **Insured**;
(4) by attending depositions, hearings and trials;
(5) by securing and giving evidence, and obtaining the attendance of witnesses;
(6) by furnishing any and all documentation within the possession of such **Insured** that may be required; and
(7) by taking such actions that such **Insured** and the **Insurer** agree are necessary and practicable to prevent or limit **Loss** arising from any **First Party Event** or **Third Party Event**.

(d) unless required to do so by law, **Insureds** shall not, without the **Insurer's** prior written consent:

(1) assume any financial obligation or incur any cost unless specifically allowed to settle any **Claim** on behalf of all **Insureds** within the retention pursuant to a **Coverage Section**.
(2) take any action, or fail to take any required action which prejudices the **Insurer's** rights under this policy.

8. **CANCELLATION**

(a) *By the **Named Entity***:  This policy may be canceled by the **Named Entity** at any time only by mailing written prior notice to the **Insurer** or by surrender of this policy to the **Insurer's** authorized agent or to the **Insurer**.

101013 (12/13)                          Page 10 of 19                          © All rights reserved.

**Pl. App. 0013**

GENERAL TERMS AND CONDITIONS

(b) *By the Insurer*: This policy may be canceled by the **Insurer's** delivering to the **Named Entity** by registered, certified, other first class mail or other reasonable delivery method, at the address of the **Named Entity** set forth in Item 1 of the Declarations, written notice stating when, not less than sixty (60) days thereafter (ten (10) days in the event of cancellation for non-payment of premium), the cancellation shall be effective. Proof of mailing or delivery of such notice as aforesaid shall be sufficient proof of notice and this policy shall be deemed canceled as to all **Insureds** at the date and hour specified in such notice.

(c) *Return of Premium*: If this policy shall be canceled by the **Named Entity**, the **Insurer** shall retain the customary short rate proportion of the premium hereon. If this policy shall be canceled by the **Insurer**, the **Insurer** shall retain the pro rata proportion of the premium hereon.

## 9. DISCOVERY

This Clause applies solely to **Claims-Made and Reported Coverage Sections** of this policy but shall not apply in the event of cancellation for non-payment of premium:

*(a) Automatic Discovery Period*: If the **Named Entity** or the **Insurer** shall cancel or refuse to renew this policy or in the event of a **Transaction** (as that term is defined in Clause 10. below), the **Named Entity** shall have the right following the effective date of such cancellation or nonrenewal to a period of sixty (60) days (the "**Automatic Discovery Period**") in which to give written notice to the **Insurer** of **Claims** first made against an **Insured** during the **Automatic Discovery Period** for any **Third Party Events** occurring prior to the end of the **Policy Period** and otherwise covered by this policy. The **Automatic Discovery Period** shall not apply where an **Optional Discovery Period** has been purchased or to **Claims** that are covered under any subsequent insurance an **Insured** purchases or that is purchased for an **Insured's** benefit, or that would be covered by any subsequent insurance but for the exhaustion of the amount of insurance applicable to such **Claims** or any applicable Retention amount.

*(b) Optional Discovery Period*: Except as indicated below, if the **Named Entity** or the **Insurer** shall cancel or refuse to renew this policy or in the event of a **Transaction** (as that term is defined in Clause 10. below), the **Named Entity** shall have the right to a period of up to three years following the effective date of such cancellation or nonrenewal (an "**Optional Discovery Period**"), upon payment of an additional premium amount of up to:

(i) one hundred percent (100%) of the full annual premium, for a period of one (1) year,
(ii) one hundred and seventy-five percent (175%) of the full annual premium, for a period of two (2) years, or
(iii) two hundred percent (200%) of the full annual premium, for a period of three (3) years,

in which to give written notice to the **Insurer** of **Claims** first made against an **Insured** during the **Optional Discovery Period** for any **Third Party Events** occurring prior to the end of the **Policy Period** and otherwise covered by this policy.

If the **Named Entity** exercises its right to purchase an **Optional Discovery Period**, that period incepts at the end of the **Policy Period** and there shall be no **Automatic Discovery Period**.

As used herein, "full annual premium" means the premium amount set forth in the Declarations as such, plus an additional premium charged for any endorsements to this policy.

Pl. App. 0014                    © All rights reserved.
GENERAL TERMS AND CONDITIONS

The right to purchase an **Optional Discovery Period** shall terminate unless written notice of election, together with any additional premium due, is received by the **Insurer** no later than thirty (30) days after the effective date of the cancellation, nonrenewal or **transaction**.

Any **Discovery Period** cannot be canceled and any additional premium charged for an **Optional Discovery Period** shall be fully earned at inception.

This Clause 9. **DISCOVERY** shall not apply to any cancellation resulting from non-payment of premium.

## 10. TRANSACTIONS

(a) If during the **Policy Period**:

(1) the **Named Entity** shall consolidate with or merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or

(2) any person or entity or group of persons or entities acting in concert shall acquire **Management Control** of the **Named Entity**;

(either of the above events herein referred to as the **"Transaction"**), then this policy shall continue in full force and effect only as to those **First Party Events** and **Third Party Events** occurring prior to the effective time of the **Transaction**.

This policy may not be canceled after the effective time of the **Transaction**.

(b) Notwithstanding the foregoing, this policy may continue in full force and effect as to those **First Party Events** and **Third Party Events** occurring subsequent to the effective time of the **Transaction** if:

(1) within thirty (30) days of such **Transaction** the **Insurer** has been provided with full particulars of the **Transaction**, the related or acquiring person(s) or entity(ies) and any other information requested by the **Insurer**; and

(2) the **Insurer** waives the restrictions set forth in Paragraph 10(a) above with respect to such **Transaction** by written endorsement to this policy and the **Named Entity** or its successor has paid any additional premium and accepted any amendments to this policy required by the **Insurer**.

## 11. SUBROGATION

An **Insured** may be able to recover all or part of **Loss** from someone other than the **Insurer**. Such **Insured** must do all that is possible after a **First Party Event** or **Third Party Event** to preserve any, and all, rights of recovery. As a condition of any payment by the **Insurer** under this policy, an **Insured's** rights to recovery will be transferred to the **Insurer**. Each **Insured** will do whatever is necessary, including signing documents, to help the **Insurer** obtain that recovery.

A **Company** may waive an **Insured's** rights to recovery against others if such **Company** does so in writing and before the **First Party Event** or **Third Party Event** occurred.

## 12. OTHER INSURANCE

101013 (12/13)        <span style="color:red">**Pl. App. 0015**</span>     Page 8 of 10          © All rights reserved.

GENERAL TERMS AND CONDITIONS

Such insurance as is provided by this policy shall apply only as excess over any other valid and collectible insurance, unless such other insurance is expressly written to be excess over the **Limit of Liability** or any applicable **Sublimit of Liability** provided by this policy.

## 13. NOTICE AND AUTHORITY

Except for the giving of a notice of **Claim**, which shall be governed by the provisions of Section 6 of these **General Terms and Conditions**, all notices required under this policy to be given by an **Insured** to the **Insurer** shall be given in writing to the **Insurer** at the address stated in Item 4(a) of the Declarations. It is agreed that the **Named Entity** shall act on behalf of all **Insureds** with respect to the giving of notice of a **Claim**, the giving and receiving of notice of cancellation and nonrenewal, the payment of premiums and the receiving of any return premiums that may become due under this policy, the receipt and acceptance of any endorsements issued to form a part of this policy, the exercising or declining of the right to tender the defense of a **Claim** to the **Insurer** and the exercising or declining to exercise any right to a **Discovery Period**.

## 14. ASSIGNMENT

This policy and any and all rights hereunder are not assignable without the prior written consent of the **Insurer**, which consent shall be in the sole and absolute discretion of the **Insurer**.

## 15. DISPUTE RESOLUTION PROCESS

It is hereby understood and agreed that all disputes or differences which may arise under or in connection with this policy, whether arising before or after termination of this policy, including any determination of the amount of **Loss**, must first be submitted to the non-binding mediation process as set forth in this Clause.

The non-binding mediation will be administered by any mediation facility to which the **Insurer** and the **Named Entity** mutually agree, in which all implicated **Insureds** and the **Insurer** shall try in good faith to settle the dispute by mediation in accordance with the American Arbitration Association's ("**AAA**") then-prevailing Commercial Mediation Rules. The parties shall mutually agree on the selection of a mediator. The mediator shall have knowledge of the legal, corporate management, or insurance issues relevant to the matters in dispute. The mediator shall also give due consideration to the general principles of the law of the state where the **Named Entity** is incorporated in the construction or interpretation of the provisions of this policy. In the event that such non-binding mediation does not result in a settlement of the subject dispute or difference:

(a) either party shall have the right to commence a judicial proceeding; or

(b) either party shall have the right, with all other parties consent, to commence an arbitration proceeding with the **AAA** that will be submitted to an arbitration panel of three (3) arbitrators as follows: (i) the implicated **Insureds** shall select one (1) arbitrator; (ii) the **Insurer** shall select one (1) arbitrator; and (iii) said arbitrators shall mutually agree upon the selection of the third arbitrator. The arbitration shall be conducted in accordance with the **AAA's** then-prevailing Commercial Arbitration Rules.

Notwithstanding the foregoing, no such judicial or arbitration proceeding shall be commenced until at least 90 days after the date the non-binding mediation shall be deemed concluded or terminated. Each party shall share equally the expenses of the non-binding mediation.

Pl. App.0016

The non-binding mediation may be commenced in New York, New York; Atlanta, Georgia; Chicago, Illinois; Denver, Colorado; or in the state indicated in Item 1 of the Declarations as the mailing address for the **Named Entity**.  The **Named Entity** shall act on behalf of each and every **Insured** in connection with any non-binding mediation under this Clause, the selection of arbitration or judicial proceeding and/or the selection of mediators or arbitrators.

## 16. ACTION AGAINST INSURER

Except as provided in Clause 15 above, no action shall lie against the **Insurer** unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of an **Insured's** obligation to pay shall have been finally determined either by judgment against such **Insured** after actual trial or by written agreement of such **Insured**, the claimant and the **Insurer**.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy.  No person or organization shall have any right under this policy to join the **Insurer** as a party to any action against an **Insured** or a **Company** to determine an **Insured's** liability, nor shall the **Insurer** be impleaded by an **Insured** or a **Company** or their legal representatives.

## 17. BANKRUPTCY

Bankruptcy or insolvency of any **Company** or any **Insured** or of their estates shall not relieve the **Insurer** of any of its obligations hereunder.

## 18. WORLDWIDE TERRITORY

Where legally permissible, this policy shall apply to **First Party Events** and **Third Party Events** occurring, **Claims** made or **Losses** suffered anywhere in the world.

## 19. HEADINGS

The descriptions in the headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.

[The balance of this page is intentionally left blank.]

Pl. App. 0017
◊ All rights reserved.

GENERAL TERMS AND CONDITIONS



Specialty Risk Protector®

*CyberEdge*<sup>SM</sup> **Cyber Extortion Insurance**
("CYBER EXTORTION COVERAGE SECTION")

**THIS IS AN OCCURRENCE COVERAGE SECTION AND A FIRST PARTY COVERAGE SECTION**

<u>Notice</u>: Pursuant to Clause 1 of the **General Terms and Conditions**, the **General Terms and Conditions** are incorporated by reference into, made a part of and are expressly applicable to this **Cyber Extortion Coverage Section**, unless otherwise explicitly stated to the contrary in either the **General Terms and Conditions** or in this **Cyber Extortion Coverage Section**.

**1. INSURING AGREEMENTS**

With respect to the **CYBER EXTORTION INSURING AGREEMENT** of this Clause 1., solely with respect to a **Security Threat** or **Privacy Threat** first occurring during the **Policy Period** and reported to the **Insurer** pursuant to the terms of this policy, this **Cyber Extortion Coverage Section** affords the following coverage:

**CYBER EXTORTION INSURING AGREEMENT**

The **Insurer** shall pay all **Loss** in excess of the applicable Retention that an **Insured** incurs solely as a result of a **Security Threat** or **Privacy Threat**.

**2. DEFINITIONS**

(a) **"Bodily Injury"** means physical injury, sickness or disease and, if arising out of the foregoing, mental anguish, mental injury, shock, humiliation or death at any time.

(b) **"Computer System"** means any computer hardware, software or any components thereof that are under the ownership, operation or control of, or that are leased by, a **Company** and are linked together through a network of two or more devices accessible through the Internet, internal network or connected with data storage or other peripheral devices.

(c) **"Confidential Information"** means any of the following in a **Company's** care, custody or control or for which a **Company** is legally responsible:
(1) information from which an individual may be uniquely and reliably identified or contacted, including, without limitation, an individual's name, address, telephone number, social security number, account relationships, account numbers, account balances, account histories and passwords;
(2) information concerning an individual that would be considered "nonpublic personal information" within the meaning of Title V of the Gramm-Leach Bliley Act of 1999 (Public Law 106-102, 113 Stat. 1338) (as amended) and its implementing regulations, or protected personal information under any similar federal, state, local or foreign law;
(3) information concerning an individual that would be considered "protected health information" or "electronic protected health information" within the Health Insurance Portability and Accountability Act of 1996 (as amended) (HIPAA) or the Health Information

<span style="color:red">PI. App.0018</span>

Technology for Economic and Clinical Health Act (HITECH Act), and their implementing regulations, or protected health-related information under any similar federal, state, local or foreign law;

(4) information used for authenticating customers for normal business transactions; or

(5) any third party's trade secrets, data, designs, interpretations, forecasts, formulas, methods, practices, processes, records, reports or other item of information that is not available to the general public.

(d) **"First Party Event"** means any **Security Threat** or **Privacy Threat**.

(e) **"Insured"** means a **Company**.

(f) **"Loss"** means:

(1) monies paid by an **Insured** with the **Insurer's** prior written consent to terminate or end a **Security Threat** or **Privacy Threat** that would otherwise result in harm to an **Insured**; and

(2) the costs to conduct an investigation to determine the cause of a **Security Threat** or **Privacy Threat**.

(g) **"Pollutants"** means, but is not limited to, any solid, liquid, gaseous, biological, radiological or thermal irritant or contaminant, including smoke, vapor, dust, fibers, mold, spores, fungi, germs, soot, fumes, acids, alkalis, chemicals and waste. "Waste" includes, but is not limited to, materials to be recycled, reconditioned or reclaimed and nuclear materials.

(h) **"Privacy Threat"** means any threat or connected series of threats to unlawfully use or publicly disclose **Confidential Information** misappropriated from an **Insured** for the purpose of demanding money, securities or other tangible or intangible property of value from an **Insured**.

(i) **"Property Damage"** means damage to, loss of use of or destruction of any tangible property. For purposes of this definition, "tangible property" shall not include electronic data.

(j) **"Security Threat"** means any threat or connected series of threats to commit an intentional attack against a **Computer System** for the purpose of demanding money, securities or other tangible or intangible property of value from an **Insured**.

## 3. EXCLUSIONS

The **Insurer** shall not be liable to make any payment for **Loss**:

(a) arising out of, based upon or attributable to any dishonest, fraudulent, criminal or malicious act, error or omission, or any intentional or knowing violation of the law, if committed by any:

(1) past or present director, officer, trustee, general or managing partner or principal (or the equivalent positions) of a **Company**, whether acting alone or in collusion with other persons; or

(2) past or present employee (other than those referenced in Sub-paragraph (1) above) or independent contractor employed by a **Company** if any of those referenced in Sub-paragraph (1) above participated in, approved of, or knew or had reason to know prior to the act of, or acquiesced to the dishonest, fraudulent, malicious, or criminal act committed by such employee or independent contractor that caused a direct loss to an

Pl. App 0019    © All rights reserved.
CYBER EXTORTION COVERAGE SECTION

**Insured** or any other person.

(b) arising out of, based upon or attributable to any misappropriation of an **Insured's** trade secret or infringement of patent, copyright, trademark, trade dress or any other intellectual property right.

(c) arising out of, based upon or attributable to any (1) presence of **Pollutants**; (2) the actual or threatened discharge, dispersal, release or escape of **Pollutants**; or (3) direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, or in any way respond to or assess the effects of **Pollutants**.

(d) for any **Bodily Injury** or **Property Damage**.

(e) arising out of, based upon or attributable to any war, invasion, military action (whether war is declared or not), civil war, mutiny, popular or military uprising, insurrection, rebellion, revolution, military or usurped power, or any action taken to hinder or defend against any of these events.

(f) arising out of, based upon or attributable to any **Security Threat** or **Privacy Threat** made by any government entity or public authority.

(g) arising out of, based upon or attributable to any **Security Threat** or **Privacy Threat** or **Related Act** thereto which has been reported, or in any circumstances of which notice has been given, under any policy of which this **Cyber Extortion Coverage Section** is a renewal or replacement or which it may succeed in time.

[The balance of this page is intentionally left blank.]

Pl. App.0020

101017 (12/13)                    Page 3 of 3              © All rights reserved.



**Specialty Risk Protector®**

*CyberEdge*<sup>SM</sup> **Security Failure/Privacy Event Management Insurance**

**("EVENT MANAGEMENT COVERAGE SECTION")**

**THIS IS A DISCOVERY COVERAGE SECTION AND A FIRST PARTY COVERAGE SECTION**

<u>Notice</u>: Pursuant to Clause 1 of the **General Terms and Conditions**, the **General Terms and Conditions** are incorporated by reference into, made a part of and are expressly applicable to this **Event Management Coverage Section**, unless otherwise explicitly stated to the contrary in the **General Terms and Conditions** or in this **Event Management Coverage Section**.

**1. INSURING AGREEMENTS**

With respect to the **EVENT MANAGEMENT INSURING AGREEMENT** of this Clause 1., solely with respect to a **Security Failure** or **Privacy Event** first discovered during the **Policy Period** and reported to the **Insurer** pursuant to the terms of this policy, this **Event Management Coverage Section** affords the following coverage:

**EVENT MANAGEMENT INSURING AGREEMENT**

The **Insurer** shall pay all **Loss**, in excess of the applicable Retention, that an **Insured** incurs solely as a result of an alleged **Security Failure** or **Privacy Event** that has actually occurred or is reasonably believed by such **Insured** and the **Insurer** to have occurred.

**2. DEFINITIONS**

(a) **"Bodily Injury"** means physical injury, sickness or disease and, if arising out of the foregoing, mental anguish, mental injury, shock, humiliation or death at any time.

(b) **"Computer System"** means any computer hardware, software or any components thereof that are linked together through a network of two or more devices accessible through the Internet, internal network or connected with data storage or other peripheral devices (including, without limitation, wireless and mobile devices), and are under ownership, operation or control of, or leased by, a **Company**.

For this **Coverage Section**, **"Computer System"** also means "cloud computing" and other hosted resources operated by a third party service provider for the purpose of providing hosted computer resources to a **Company** as provided in a written contract between such third party and a **Company**.

(c) **"Confidential Information"** means any of the following in a **Company's** or **Information Holder's** care, custody or control or for which a **Company** or **Information Holder** is legally responsible:

(1) information from which an individual may be uniquely and reliably identified or contacted,

101018 (12/13)   <span style="color:red">Pl. App.0021</span>   Page 1 of 5   © All rights reserved.

EVENT MANAGEMENT COVERAGE SECTION

including, without limitation, an individual's name, address, telephone number, social security number, account relationships, account numbers, account balances, account histories and passwords;

(2) information concerning an individual that would be considered "nonpublic personal information" within the meaning of Title V of the Gramm-Leach Bliley Act of 1999 (Public Law 106-102, 113 Stat. 1338) (as amended) and its implementing regulations, or protected personal information under any similar federal, state, local or foreign law;

(3) information concerning an individual that would be considered "protected health information" or "electronic protected health information" within the Health Insurance Portability and Accountability Act of 1996 (as amended) (HIPAA) or the Health Information Technology for Economic and Clinical Health Act (HITECH Act), and their implementing regulations, or protected health-related information under any similar federal, state, local or foreign law;

(4) information used for authenticating customers for normal business transactions; or

(5) any third party's trade secrets, data, designs, interpretations, forecasts, formulas, methods, practices, processes, records, reports or other item of information that is not available to the general public.

(d) **"Electronic Data"** means any software or electronic data stored electronically on a **Computer System**, including without limitation **Confidential Information.**

(e) **"First Party Event"** means any **Privacy Event** or **Security Failure.**

(f) **"Information Holder"** means a third party that:

(1) an **Insured** has provided **Confidential Information** to; or
(2) has received **Confidential Information** on behalf of a **Company.**

(g) **"Insured"** means a **Company.**

(h) **"Loss"** means the following reasonable and necessary expenses and costs incurred by an **Insured** within one year of the discovery of the **Security Failure** or **Privacy Event:**

(1) to conduct an investigation (including a forensic investigation) to determine the cause of the **Security Failure** or **Privacy Event;**

(2) for a public relations firm, crisis management firm or law firm agreed to by the **Insurer** to advise an **Insured** on minimizing the harm to such **Insured**, including, without limitation, maintaining and restoring public confidence in such **Insured;**

(3) to notify those whose **Confidential Information** is the subject of the **Security Failure** or **Privacy Event** and advise of any available remedy in connection with the **Security Failure** or **Privacy Event**, including, without limitation, those expenses and costs for printing, advertising and mailing of materials;

(4) for identity theft education and assistance, identity theft call center services, credit file or identity monitoring and victim reimbursement insurance made available to those persons notified about a **Security Failure** or **Privacy Event** pursuant to subparagraph (3) above;

(5) for any other services approved by the **Insurer** at the **Insurer's** sole and absolute discretion;

(6) to restore, recreate or recollect **Electronic Data;** or

(7) to determine whether **Electronic Data** can or cannot be restored, recollected or recreated.

101018 (12/13)   Pl. App 0022 Page 2 of 5   ® All rights reserved.

EVENT MANAGEMENT COVERAGE SECTION

Provided, however, **Loss** shall not include compensation, fees, benefits, overhead or internal charges of any **Insured**.

(i) *"Pollutants"* means, but is not limited to, any solid, liquid, gaseous, biological, radiological or thermal irritant or contaminant, including smoke, vapor, dust, fibers, mold, spores, fungi, germs, soot, fumes, acids, alkalis, chemicals and waste. "Waste" includes, but is not limited to, materials to be recycled, reconditioned or reclaimed and nuclear materials.

(j) **"Privacy Event"** means any failure to protect **Confidential Information** (whether by "phishing," other social engineering technique or otherwise), including, without limitation, that which could result in an identity theft or other wrongful emulation of the identity of an individual or corporation.

(k) **"Property Damage"** means damage to, loss of use of or destruction of any tangible property. For purposes of this definition, "tangible property" shall not include electronic data.

(l) **"Security Failure"** means a failure or violation of the security of a **Computer System**, including, without limitation, that which results in or fails to mitigate any unauthorized access, unauthorized use, denial of service attack or receipt or transmission of a malicious code. " **Security Failure"** includes any such failure or violation resulting from the theft of a password or access code from an **Insured's** premises, the **Computer System**, or an officers, director or employee of a **Company** by non-electronic means.

## 3. EXCLUSIONS

The **Insurer** shall not be liable to make any payment for **Loss**:

(a) arising out of, based upon or attributable to any dishonest, fraudulent, criminal or malicious act, error or omission, or any intentional or knowing violation of the law, if committed by any:

    (1) past or present director, officer, trustee, general or managing partner or principal (or the equivalent positions) of a **Company**, whether acting alone or in collusion with other persons; or

    (2) past or present employee (other than those referenced in Sub-paragraph (1) above) or independent contractor employed by a **Company** if any person referenced in Sub-paragraph (1) above participated in, approved of, acquiesced to, or knew or had reason to know prior to the act of, the dishonest, fraudulent, malicious, or criminal act committed by such employee or independent contractor that caused a direct loss to an **Insured** or any other person.

(b) arising out of, based upon or attributable to any misappropriation of an **Insured's** trade secret, any misappropriation of a trade secret by an **Insured** or any employee of an **Insured** or any infringement of patent, copyright, trademark or trade dress.

(c) arising out of, based upon or attributable to any (1) presence of **Pollutants**; (2) the actual or threatened discharge, dispersal, release or escape of **Pollutants**; or (3) direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, or in any way respond to or assess the effects of **Pollutants**.

Pl. App 0023

© All rights reserved.

EVENT MANAGEMENT COVERAGE SECTION

(d) for any **Bodily Injury** or **Property Damage**.

(e) arising out of, based upon or attributable to any:

    (1) fire, smoke, explosion, lightning, wind, water, flood, earthquake, volcanic eruption, tidal wave, landslide, hail, act of God or any other physical event, however caused;

    (2) war, invasion, military action (whether war is declared or not), civil war, mutiny, popular or military uprising, insurrection, rebellion, revolution, military or usurped power, or any action taken to hinder or defend against any of these events; or

    (3) satellite failure.

(f) arising out of, based upon or attributable to any seizure, confiscation, nationalization, or destruction of a **Computer System** or **Electronic Data** by order of any governmental or public authority.

(g) arising out of, based upon or attributable to any **Security Failure** or **Privacy Event**, or any **Related Acts** thereto, which has been reported, or in any circumstances of which notice has been given, under any policy of which this **Event Management Coverage Section** is a renewal or replacement or which it may succeed in time.

(h) for any profit or advantage to which any **Insured** is not legally entitled.

(i) arising out of, based upon or attributable to any amounts for: (i) the original creation of; (ii) diminution of value of; (iii) lost profits of; (iv) or loss of use of, a trade secret, patent, copyright, trademark, trade dress or any other intellectual property.

## 4. NOTICE

In addition to the applicable items of Clause 6. **NOTICE** of the **General Terms and Conditions**, and before coverage will apply for **Loss** under this **Event Management Coverage Section**, each **Insured** must also:

(a) complete and sign a written, detailed and affirmed proof of loss within ninety (90) days after the discovery of any **Loss** (unless such period has been extended by the **Insurer** in writing) which shall include, among any other pertinent information:

    (1) a full description of such **Loss** and the circumstances surrounding such **Loss**, which shall include, among any other necessary information, the time, place and cause of the **Loss**;

    (2) a detailed calculation of any **Loss**; and

    (3) all underlying documents and materials that reasonably relate to or form any part of the proof of such **Loss**.

(b) upon the **Insurer's** request, submit to an examination under oath.

(c) immediately record the specifics of any **Loss**, **Security Failure** or **Privacy Event** and the date such **Insured** first became aware of such **Loss**, **Security Failure** or **Privacy Event**.

(d) provide the **Insurer** with any cooperation and assistance that the **Insurer** may request, including

<span style="color:red">Pl. App.0024</span>

101018 (12/13)                    Page 4 of 5              ◈ All rights reserved.

EVENT MANAGEMENT COVERAGE SECTION

assisting the **Insurer** in:

(1) any investigation of a **Security Failure, Privacy Event, Loss** or circumstance;
(2) enforcing any legal rights an **Insured** or the **Insurer** may have against anyone who may be liable to an **Insured**; and
(3) executing any documents that the **Insurer** deems necessary to secure its rights under this policy.

All adjusted claims shall be due and payable thirty (30) days after the presentation and written acceptance by the **Insurer** of satisfactory proof of **Loss** to the address set forth in the **General Terms and Conditions**. The costs and expenses of establishing or proving an **Insured's Loss** under this **Event Management Coverage Section,** including, without limitation, those connected with preparing a proof of loss, shall be such **Insured's** obligation, and are not covered under this policy.

[The balance of this page is intentionally left blank.]

Pl. App 0025

101018 (12/13)                    Page 5 of 5                    © All rights reserved.
EVENT MANAGEMENT COVERAGE SECTION



Specialty Risk Protector®

*CyberEdge*<sup>SM</sup> **Security and Privacy Liability Insurance**
**("SECURITY AND PRIVACY COVERAGE SECTION")**

THIS IS A CLAIMS MADE AND REPORTED COVERAGE SECTION AND A THIRD PARTY COVERAGE SECTION

Notice: Pursuant to Clause 1 of the **General Terms and Conditions**, the **General Terms and Conditions** are incorporated by reference into, made a part of and are expressly applicable to this **Security and Privacy Coverage Section**, unless otherwise explicitly stated to the contrary in the **General Terms and Conditions** or in this **Security and Privacy Coverage Section**.

**1. INSURING AGREEMENTS**

With respect to the **SECURITY AND PRIVACY INSURING AGREEMENT**, the **DEFENSE** provisions and the **SETTLEMENT** provisions of this Clause 1., solely with respect to **Claims** first made against an **Insured** during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy, this **Security and Privacy Coverage Section** affords the following coverage:

**SECURITY AND PRIVACY INSURING AGREEMENT**

The **Insurer** shall pay on an **Insured's** behalf all **Loss** in excess of the applicable Retention that such **Insured** is legally obligated to pay resulting from a **Claim** alleging a **Security Failure** or a **Privacy Event**.

**DEFENSE**

(a) The **Insurer** has the right and duty to defend a **Suit** or **Regulatory Action** alleging a **Security Failure** or a **Privacy Event**, even if the **Suit** or **Regulatory Action** is groundless, false or fraudulent.

(b) The **Insurer** has the right to investigate any **Claim**.

(c) The **Insurer's** duty to defend ends if an **Insured** refuses to consent to a settlement that the **Insurer** recommends pursuant to the **SETTLEMENT** provision below and that the claimant will accept.   As a consequence of such **Insured's** refusal, the **Insurer's** liability shall not exceed the amount for which the **Insurer** could have settled such **Claim** had such **Insured** consented, plus **Defense Costs** incurred prior to the date of such refusal, plus 50% of **Defense Costs** incurred with the **Insurer's** prior written consent after the date of such refusal.  This Clause shall not apply to any settlement where the total incurred **Loss** does not exceed the applicable Retention amount.

**SETTLEMENT**

(a) The **Insurer** has the right, with the written consent of an **Insured**, to settle any **Claim** if the **Insurer** believes that it is proper.

<span style="color:red">Pl. App.0026</span>

101024 (12/13)                     Page 1 of 8                     © All rights reserved.
SECURITY AND PRIVACY COVERAGE SECTION

(b) An **Insured** may settle any **Claim** on behalf of all **Insureds** to which this insurance applies and which are subject to one Retention amount where the total incurred **Loss** does not exceed the Retention amount.

## 2. DEFINITIONS

(a) **"Bodily Injury"** means physical injury, sickness or disease, and, if arising out of the foregoing, mental anguish, mental injury, shock, humiliation or death at any time.

(b) **"Claim"** means:

    (1) a written demand for money, services, non-monetary relief or injunctive relief;
    (2) a written request for mediation or arbitration, or to toll or waive an applicable statute of limitations;
    (3) a **Suit**; or
    (4) a **Regulatory Action**.

(c) **"Computer System"** means any computer hardware, software or any components thereof that are linked together through a network of two or more devices accessible through the Internet, internal network or connected with data storage or other peripheral devices (including, without limitation, wireless and mobile devices), and are under ownership, operation or control of, or leased by, a **Company**.

For this **Coverage Section**, **"Computer System"** also means "cloud computing" and other hosted resources operated by a third party service provider for the purpose of providing hosted computer resources to a **Company** as provided in a written contract between such third party and a **Company**.

(d) **"Confidential Information"** means any of the following in a **Company's** or **Information Holder's** care, custody or control or for which a **Company** or **Information Holder** is legally responsible:

    (1) information from which an individual may be uniquely and reliably identified or contacted, including, without limitation, an individual's name, address, telephone number, social security number, account relationships, account numbers, account balances, account histories and passwords;
    (2) information concerning an individual that would be considered "nonpublic personal information" within the meaning of Title V of the Gramm-Leach Bliley Act of 1999 (Public Law 106-102, 113 Stat. 1338) (as amended) and its implementing regulations, or protected personal information under any similar federal, state, local or foreign law;
    (3) information concerning an individual that would be considered "protected health information" or "electronic protected health information" within the Health Insurance Portability and Accountability Act of 1996 (as amended) (HIPAA) or the Health Information Technology for Economic and Clinical Health Act (HITECH Act), and their implementing regulations, or protected health-related information under any similar federal, state, local or foreign law;
    (4) information used for authenticating customers for normal business transactions; or
    (5) any third party's trade secrets, data, designs, interpretations, forecasts, formulas, methods, practices, processes, records, reports or other item of information that is not available to the general public.

(e) **"Defense Costs"** means all reasonable and necessary fees charged by an attorney appointed by the **Insurer** (unless otherwise provided for by this policy) in connection with any **Suit** or **Regulatory Action** brought against an **Insured**, as well as all other reasonable and necessary fees, costs and expenses (including premiums for any appeal bond, attachment bond or similar bond arising out of a covered judgment, but without any obligation to apply for or furnish any such bond) incurred in the defense or investigation of a **Claim** by the **Insurer** or by an **Insured** with the **Insurer's** written consent. **Defense Costs** shall not include: (i) compensation of any natural person **Insured**; or (ii) any fees, costs or expenses incurred prior to the time that a **Claim** is first made against an **Insured**.

(f) **"Information Holder"** means a third party that:
(1) a **Company** has provided **Confidential Information** to; or
(2) has received **Confidential Information** on behalf of a **Company.**

(g) **"Insured"** means:

(1) a **Company**;
(2) any past, present or future officer, director, trustee or employee of a **Company** acting in their capacity as such (and in the event a **Company** is a partnership, limited liability partnership or limited liability company, then any general or managing partner or principal thereof acting in their capacity as such); and
(3) any entity which a **Company** is required by contract to add as an **Insured** under this **Security and Privacy Coverage Section**, but only for the acts of such **Company** that result in a **Security Failure** or a **Privacy Event**.

(h) **"Loss"** means compensatory damages, judgments, settlements, pre-judgment and post-judgment interest and **Defense Costs**, including without limitation:

(1) punitive, exemplary and multiple damages where insurable by the applicable law which most favors coverage for such punitive, exemplary and multiple damages;
(2) civil fines or penalties imposed by a governmental agency and arising from a **Regulatory Action**, unless the civil fine or penalty imposed is uninsurable under the law of the jurisdiction imposing such fine or penalty;
(3) any monetary amounts an **Insured** is required by law or has agreed to by settlement to deposit into a consumer redress fund; and
(4) amounts payable in connection with a **PCI-DSS Assessment**.

(i) **"PCI Data Security Standards"** means generally accepted and published Payment Card Industry standards for data security (commonly referred to as "PCI-DSS").

(j) **"PCI-DSS Assessment"** means any written demand received by an **Insured** from a Payment Card Association (e.g., MasterCard, Visa, American Express) or bank processing payment card transactions (i.e., an "Acquiring Bank") for a monetary assessment (including a contractual fine or penalty) in connection with an **Insured's** non-compliance with **PCI Data Security Standards** which resulted in a **Security Failure** or **Privacy Event**.

(k) **"Pollutants"** means, but is not limited to, any solid, liquid, gaseous, biological, radiological or thermal irritant or contaminant, including smoke, vapor, dust, fibers, mold, spores, fungi, germs, soot, fumes, acids, alkalis, chemicals and waste. "Waste" includes, but is not limited to, materials to be recycled, reconditioned or reclaimed and nuclear materials.

Pl. App.0028

(l) **"Privacy Event"** means the following occurring on or after the **Retroactive Date** and prior to the end of the **Policy Period**:

    (1) any failure to protect **Confidential Information** (whether by "phishing," other social engineering technique or otherwise) including, without limitation, that which could result in an identity theft or other wrongful emulation of the identity of an individual or corporation;

    (2) any failure to disclose an event referenced in Sub-paragraph (1) above in violation of any **Security Breach Notice Law;**

    (3) any unintentional failure of an **Insured** to comply with those parts of a **Company's** privacy policy that (a) prohibit or restrict the disclosure or sale of **Confidential Information** by an **Insured**, or (b) require an **Insured** to allow an individual to access or correct **Confidential Information** about such individual; or

    (4) any violation of a federal, state, foreign or local privacy statute alleged in connection with a **Claim** for a failure described in Sub-paragraphs (1) or (2) above.

(m) **"Property Damage"** means damage to, loss of use of or destruction of any tangible property. For purposes of this definition, "tangible property" shall not include electronic data.

(n) **"Regulatory Action"** means a request for information, civil investigative demand or civil proceeding brought by or on behalf of a governmental agency, including requests for information related thereto.

(o) **"Security Breach Notice Law"** means any federal, state, local or foreign statute or regulation that requires an entity collecting or storing **Confidential Information**, or any entity that has provided **Confidential Information** to an **Information Holder**, to provide notice of any actual or potential unauthorized access by others to such **Confidential Information**, including but not limited to, the statute known as California SB 1386 (§1798.82, *et. seq.* of the California Civil Code).

(p) **"Security Failure"** means the following occurring on or after the **Retroactive Date** and prior to the end of the **Policy Period**:

    (1) a failure or violation of the security of a **Computer System** including, without limitation, that which results in or fails to mitigate any unauthorized access, unauthorized use, denial of service attack or receipt or transmission of a malicious code;

    (2) failure to disclose an event referenced in Sub-paragraphs (1) above in violation of any **Security Breach Notice Law.**

    **"Security Failure"** includes any such failure or violation, resulting from the theft of a password or access code from an **Insured's** premises, the **Computer System**, or an officer, director or employee of a **Company** by non-electronic means.

(q) **"Suit"** means a civil proceeding for monetary, non-monetary or injunctive relief, which is

<span style="color:red">Pl. App 0029</span>

© All rights reserved.
SECURITY AND PRIVACY COVERAGE SECTION

commenced by service of a complaint or similar pleading.  **Suit** includes a binding arbitration proceeding to which an **Insured** must submit or does submit with the **Insurer's** consent.

(r)  "Third Party Event" means a **Security Failure** or **Privacy Event**.

## 3.  EXCLUSIONS

This policy shall not cover **Loss** in connection with a **Claim** made against an **Insured**:

(a) alleging, arising out of, based upon or attributable to any dishonest, fraudulent, criminal or malicious act, error or omission, or any intentional or knowing violation of the law, if committed by any:

    (1) past or present director, officer, trustee, general or managing partner or principal (or the equivalent positions) of a **Company**, whether acting alone or in collusion with other persons; or

    (2) past or present employee or independent contractor employed by a **Company** or an **Information Holder** if any person referenced in Sub-paragraph (1) above knew or had reason to know prior to the act of, participated in, approved of or acquiesced to the dishonest, fraudulent, malicious, or criminal act committed by such employee or independent contractor that caused a direct loss to an **Insured** or any other person;

provided, however, the **Insurer** will defend **Suits** that allege any of the foregoing conduct by such person, and that are not otherwise excluded, until there is a final, non-appealable judgment or adjudication as to such conduct in any action or proceeding other than an action or proceeding initiated by the **Insurer** to determine coverage under this policy, at which time the **Insureds** shall reimburse the **Insurer** for **Defense Costs**.

(b) alleging, arising out of, based upon or attributable to any infringement of patent, or any misappropriation of a trade secret by any **Insured**.

(c) alleging, arising out of, based upon or attributable to any (1) presence of **Pollutants**, (2) the actual or threatened discharge, dispersal, release or escape of **Pollutants**, or (3) direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, or in any way respond to or assess the effects of **Pollutants**.

(d) alleging, arising out of, based upon or attributable to any **Bodily Injury** or **Property Damage**.

(e) alleging, arising out of, based upon or attributable to any:

    (1) fire, smoke, explosion, lightning, wind, water, flood, earthquake, volcanic eruption, tidal wave, landslide, hail, act of God or any other physical event, however caused;

    (2) strikes or similar labor action, war, invasion, military action (whether war is declared or not), civil war, mutiny, popular or military uprising, insurrection, rebellion, revolution, military or usurped power, or any action taken to hinder or defend against any of these events;

    (3) electrical or mechanical failures of infrastructure not under the control of an **Insured**, including any electrical power interruption, surge, brownout or blackout; provided, however, this Sub-paragraph (3) shall not apply to a **Security Failure** or a **Privacy Event**  that is caused by such electrical or mechanical failure;

Pl. App.0030

(4) failure of telephone lines, data transmission lines or other telecommunications or networking infrastructure not under the control of an **Insured**; provided, however, this Sub-paragraph (4) shall not apply to a **Security Failure** or a **Privacy Event** that is caused by such failure of telephone lines, data transmission lines or other telecommunication or networking infrastructure; or

(5) satellite failure.

(f) alleging, arising out of, based upon or attributable to any:

(1) purchase, sale, or offer or solicitation of an offer to purchase or sell securities;

(2) violation of any securities law, including the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, or any regulation promulgated under the foregoing statutes, or any federal, state or local laws similar to the foregoing statutes (including "Blue Sky" laws), whether such law is statutory, regulatory or common law; provided, however, this exclusion does not apply to a **Claim** alleging a **Privacy Event** in violation of Regulation S-P (17 C.F.R. § 248); provided further, however, this exclusion does not apply to a **Claim** alleging a failure to disclose a **Security Failure** or **Privacy Event** in violation of any **Security Breach Notice Law**; or

(3) violation of the Organized Crime Control Act of 1970 (commonly known as Racketeer Influenced And Corrupt Organizations Act, or "RICO"), as amended, or any regulation promulgated thereunder or any federal, state or local law similar to the foregoing, whether such law is statutory, regulatory or common law;

(g) alleging, arising out of, based upon or attributable to an **Insured**'s employment of any individual or any of an **Insured's** employment practices (including, without limitation, wrongful dismissal, discharge or termination, discrimination, harassment, retaliation or other employment-related claim); provided, however, this exclusion shall not apply to any **Claim** by an individual to the extent such individual is alleging (1) a **Privacy Event** in connection with such individual's employment or application for employment with a **Company,** or (2) a failure to disclose a **Security Failure** or **Privacy Event** in violation of any **Security Breach Notice Law**

(h) alleging, arising out of, based upon or attributable to antitrust, unfair competition, restraint of trade, including, without limitation, violations of any local, state or federal law regulating such conduct, or that is brought by or on behalf of the Federal Trade Commission ("FTC") or any other federal, state or local government agency, or foreign government agency; provided, however, solely with respect to unfair competition, this Paragraph (h) shall not apply to any **Loss** arising out of a covered **Regulatory Action.**

(i) brought by or on behalf of:

(1) any **Insured;**

(2) any business entity that is controlled, managed or operated, directly or indirectly, in whole or in part, by an **Insured;** or

(3) any parent company, **Subsidiary,** successor or assignee of an **Insured,** or any person or entity affiliated with an **Insured** or such business entity through common **Management Control;**

provided, however, this exclusion shall not apply to (i) an **Insured** as described in Sub-paragraph (3) of the definition of **Insured;** or (ii) an **Insured** as described in Sub-paragraph

Pl. App 0031

(2) of the definition of **Insured** but only to the extent such **Insured** is alleging a **Privacy Event** or a failure to disclose a **Security Failure** or **Privacy Event** in violation of any **Security Breach Notice Law**.

(j)   for any of the following:

    (1)   the return of an **Insured's** fees or compensation;

    (2)   any profit or advantage to which an **Insured** is not legally entitled;

    (3)   an **Insured's** expenses or charges, including employee compensation and benefits, overhead, over-charges or cost over-runs;

    (4)   an **Insured's** cost of providing, correcting, re-performing or completing any services;

    (5)   civil or criminal fines or penalties imposed by law against an **Insured** and any matters deemed uninsurable under the law pursuant to which this policy shall be construed; provided, however, this Sub-paragraph (5) shall not apply to (a) any monetary amounts an **Insured** is required by law or has agreed to by settlement to deposit into a consumer redress fund, or (b) any civil fine or penalty imposed by a governmental agency arising from a **Regulatory Action**, unless the civil fine or penalty imposed is uninsurable under the law of the jurisdiction imposing such fine or penalty;

    (6)   an **Insured's** costs and expenses of complying with any injunctive or other form of equitable relief;

    (7)   taxes incurred by an **Insured**;

    (8)   the amounts for which an **Insureds** is not financially liable or which are without legal recourse to any **Insured**;

    (9)   amounts an **Insured** agrees to pay pursuant to a contract, including without limitation, liquidated damages, setoffs or penalties; provided, however, this exclusion shall not apply to any **PCI-DSS Assessment**.

(k)  alleging, arising out of, based upon or attributable to any obligation an **Insured** has under contract; provided, however, this exclusion shall not apply to:

    (1) the obligation to prevent a **Security Failure** or a **Privacy Event**, including without limitation, whether same is in violation of an implied or statutory standard of care;

    (2) liability an **Insured** would have in the absence of such contract or agreement;

    (3) the obligation to comply with **PCI Data Security Standards**; or

    (4) with respect to a **Privacy Event**, any liability or obligation under the confidentiality or non-disclosure provisions of any agreement;

(l)   alleging, arising out of, based upon or attributable to any **Security Failure** or **Privacy Event**, or any **Related Acts** thereto, alleged or contained in any **Claim** which has been reported, or in any circumstances of which notice has been given, under any policy of which this **Security and Privacy Coverage Section** is a renewal or replacement or which it may succeed in time.

(m) alleging, arising out of, based upon or attributable to any **Security Failure** or **Privacy Event** occurring prior to the **Retroactive Date** or any **Related Acts** thereto, regardless of when such **Related Act** occurs.

<div align="center" style="color:red">**Pl. App.0032**</div>

101024 (12/13)                          Page 7 of 8                          ⊕ All rights reserved.
<div align="center">SECURITY AND PRIVACY COVERAGE SECTION</div>

(n) alleging, arising out of, based upon or attributable to any **Security Failure** or **Privacy Event** occurring prior to the **Continuity Date**, or any **Related Act** thereto (regardless of when such **Related Act** occurs), if, as of the **Continuity Date**, an **Insured** knew or could have reasonably foreseen that such **Security Failure** or a **Privacy Event** did or would result in a **Claim** against an **Insured**.

(o) alleging, arising out of, based upon or attributable to any seizure, confiscation, nationalization, or destruction of a **Computer System** by order of any governmental or public authority.

(p) for (1) the theft of money or securities from an **Insured**; or (2) the transfer or loss of money or securities from or to an **Insured's** accounts or accounts under an **Insured's** control, including customer accounts. For purposes of this Sub-paragraph (p), the term "accounts" shall include, but are not limited to, deposit, credit, debit, prepaid and securities brokerage accounts.

## 4. LIMIT OF LIABILITY

The following provisions shall apply in addition to the provisions of Clause 4. **LIMIT OF LIABILITY** of the **General Terms and Conditions:**

Notwithstanding anything in the policy to the contrary, the maximum liability of the **Insurer** for all **Loss** arising from a **Regulatory Action** shall be the **Regulatory Action Sublimit of Liability** set forth in Item 6 of the Declarations. This amount shall be part of and not in addition to the **Limit of Liability** and any applicable **Sublimit of Liability.**

[The balance of this page is intentionally left blank.]



Specialty Risk Protector®

*CyberEdge*<sup>SM</sup> Network Interruption Insurance
("NETWORK INTERRUPTION COVERAGE SECTION")

THIS IS AN OCCURRENCE COVERAGE SECTION AND A FIRST PARTY COVERAGE SECTION

Notice: Pursuant to Clause 1 of the **General Terms and Conditions**, the **General Terms and Conditions** are incorporated by reference into, made a part of and are expressly applicable to this **Network Interruption Coverage Section**, unless otherwise explicitly stated to the contrary in the **General Terms and Conditions** or in this **Network Interruption Coverage Section**.

## 1. INSURING AGREEMENTS

With respect to the **NETWORK INTERRUPTION INSURING AGREEMENT** of this Clause 1., solely with respect to a **Security Failure** first occurring during the **Policy Period** and reported to the **Insurer** pursuant to the terms of this policy, this **Network Interruption Coverage Section** affords the following coverage:

**NETWORK INTERRUPTION INSURING AGREEMENT**

The **Insurer** shall pay all **Loss** in excess of the **Remaining Retention** that an **Insured** incurs after the **Waiting Hours Period** and solely as a result of a **Security Failure.**

## 2. DEFINITIONS

(a) "**Bodily Injury**" means physical injury, sickness or disease and, if arising out of the foregoing, mental anguish, mental injury, shock, humiliation or death at any time.

(b) "**Computer System**" means any computer hardware, software or any components thereof that are linked together through a network of two or more devices accessible through the Internet, internal network or connected with data storage or other peripheral devices (including, without limitation, wireless and mobile devices), and are under the ownership, operation or control of, or leased by, a **Company.**

For this **Coverage Section**, "**Computer System**" also means computer hardware, software or any components thereof that are under the ownership, operation or control of an **Outsource Provider.**

(c) "**First Party Event**" means any **Security Failure.**

(d) "**Insured**" means a **Company.**

(e) "**Loss**" means the below listed costs incurred from the beginning of a **Material Interruption** through the 120th day after the end of the **Material Interruption** (or 120 days after the **Material Interruption** would have ended if an **Insured** exercised due diligence and dispatch):

<span style="color:red">Pl. App.0034</span>

       (1) costs that would not have been incurred but for a **Material Interruption**; and
       (2) the sum of all of following, which shall be calculated on an hourly basis:
          (a) Net Income (Net Profit or Loss before income taxes) that would have been earned; and
          (b) Continuing normal operating expenses incurred, including payroll.

(f) **"Material Interruption"** means the actual and measurable interruption or suspension of an **Insured's** business directly caused by a **Security Failure.**

(g) **"Outsource Provider"** means an entity not owned, operated or controlled by an **Insured** that such **Insured** depends on to conduct its business.

(h) *"Pollutants"* means, but is not limited to, any solid, liquid, gaseous, biological, radiological or thermal irritant or contaminant, including smoke, vapor, dust, fibers, mold, spores, fungi, germs, soot, fumes, acids, alkalis, chemicals and waste. "Waste" includes, but is not limited to, materials to be recycled, reconditioned or reclaimed and nuclear materials.

(i) **"Property Damage"** means damage to, loss of use of or destruction of any tangible property. For purposes of this definition, "tangible property" shall not include electronic data.

(j) **"Remaining Retention"** means the Retention set forth in Item 6 of the Declarations for this **Network Interruption Coverage Section** less the amount of **Loss** incurred by any **Insured** during the **Waiting Hours Period**. If the **Loss** incurred by any **Insured** during the **Waiting Hours Period** is greater than the applicable Retention set forth in the Declarations, the **Remaining Retention** equals zero.

(k) **"Security Failure"** means a failure or violation of the security of a **Computer System**, including, without limitation, that which results in or fails to mitigate any unauthorized access, unauthorized use, denial of service attack or receipt or transmission of a malicious code. " **Security Failure"** includes any such failure or violation resulting from the theft of a password or access code from a **Company's** premises, a **Company's Computer System**, or an officer, director or employee of a **Company** by non-electronic means.

(l) **"Waiting Hours Period"** means the number of hours set forth in Item 6 of the Declarations that must elapse once a **Material Interruption** has begun.

## 3. EXCLUSIONS

The **Insurer** shall not be liable to make any payment for **Loss**:

(a) arising out of, based upon or attributable to any dishonest, fraudulent, criminal or malicious act, error or omission, or any intentional or knowing violation of the law, if committed by any:

       (1) past or present director, officer, trustee, general or managing partner or principal (or the equivalent positions) of a **Company**, whether acting alone or in collusion with other persons; or

       (2) past or present employee (other than those referenced in Sub-paragraph (1) above) or independent contractor employed by a **Company** if any of those referenced in Sub-paragraph (1) above participated in, approved of, acquiesced to, or knew or had reason

101021 (12/13)             Page 2 of 5          © All rights reserved.

Pl. App. 0035

NETWORK INTERRUPTION COVERAGE SECTION

to know prior to the act of, the dishonest, fraudulent, malicious, or criminal act committed by such employee or independent contractor that caused a direct loss to an **Insured** or any other person.

(b) arising out of, based upon or attributable to any misappropriation or theft of trade secret or infringement of patent, copyright, trademark, trade dress or any other intellectual property right.

(c) arising out of, based upon or attributable to any (1) presence of **Pollutants**; (2) the actual or threatened discharge, dispersal, release or escape of **Pollutants**; or (3) direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, or in any way respond to or assess the effects of **Pollutants**.

(d) arising out of, based upon or attributable to any **Bodily Injury** or **Property Damage.**

(e) arising out of, based upon or attributable to any:

    (1) fire, smoke, explosion, lightning, wind, water, flood, earthquake, volcanic eruption, tidal wave, landslide, hail, act of God or any other physical event, however caused;
    (2) war, invasion, military action (whether war is declared or not), civil war, mutiny, popular or military uprising, insurrection, rebellion, revolution, military or usurped power, or any action taken to hinder or defend against any of these events; or
    (3) satellite failure.

(f) arising out of, based upon or attributable to any seizure, confiscation, nationalization, or destruction of a **Computer System** by order of any governmental or public authority.

(g) arising out of, based upon or attributable to any **Security Failure** or **Related Act** thereto which has been reported, or in any circumstances of which notice has been given, under any policy of which this **Network Interruption Coverage Section** is a renewal or replacement or which it may succeed in time.

(h) for any profit or advantage to which any **Insured** is not legally entitled.

(i) arising out of, based upon or attributable to: (1) any liability to third-parties for whatever reason; (2) legal costs or legal expenses of any type; (3) updating, upgrading, enhancing, or replacing any **Computer System** to a level beyond that which existed prior to sustaining **Loss**; (4) unfavorable business conditions; or (5) the removal of software program errors or vulnerabilities.

## 4. LIMIT OF LIABILITY

The following provisions shall apply in addition to the provisions of Clause 4. **LIMIT OF LIABILITY** of the **General Terms and Conditions**:

Notwithstanding anything in the policy to the contrary, the maximum liability of the **Insurer** for all **Loss** arising from a **Security Failure** of the **Computer System** of an **Outsource Provider** shall be $100,000. This amount shall be part of and not in addition to the **Limit of Liability** or any applicable **Sublimit of Liability.**

<span style="color:red">Pl. App.0036</span>

101021 (12/13)                          Page 3 of 5                          ⊕ All rights reserved.

NETWORK INTERRUPTION COVERAGE SECTION

## 5. RETENTION

The following provisions shall apply in addition to the provisions of Clause 5. **RETENTION** of the **General Terms and Conditions**:

Solely with respect to this **Network Interruption Coverage Section**, the applicable Retention shall be the **Remaining Retention**.

## 6. NOTICE

In addition to the applicable items of Clause 6. **NOTICE** of the **General Terms and Conditions**, and before coverage will apply for **Loss** under this **Network Interruption Coverage Section**, each **Insured** must also:

(a) complete and sign a written, detailed and affirmed proof of loss within ninety (90) days after the discovery of any **Loss** (unless such period has been extended by the **Insurer** in writing) which shall include, among any other pertinent information:

    (1) a full description of such **Loss** and the circumstances surrounding such **Loss**, which shall include, among any other necessary information, the time, place and cause of the **Loss**;
    (2) a detailed calculation of any **Loss**; and
    (3) all underlying documents and materials that reasonably relate to or form a part of the basis of the proof of such **Loss**.

(b) upon the **Insurer's** request, submit to an examination under oath.

(c) immediately record the specifics of any **Loss** or **Security Failure** and the date such **Insured** first became aware of such **Loss** or **Security Failure**.

(d) provide the **Insurer** with any cooperation and assistance that the **Insurer** may request, including assisting the **Insurer** in:

    (1) any investigation of a **Security Failure**, **Loss** or circumstance;
    (2) enforcing any legal rights an **Insured** or the **Insurer** may have against anyone who may be liable to an **Insured**;
    (3) executing any documents that the **Insurer** deem necessary to secure its rights under this policy; and
    (4) any calculation or appraisal conducted by or on behalf of the **Insurer** pursuant to this **Network Interruption Coverage Section**.

All adjusted claims shall be due and payable thirty (30) days after the presentation and written acceptance by the **Insurer** of satisfactory proof of **Loss** to the address set forth in the **General Terms and Conditions**. The costs and expenses of establishing or proving an **Insured's Loss** under this **Network Interruption Coverage Section**, including, without limitation, those connected with preparing a proof of loss, shall be such **Insured's** obligation, and are not covered under this policy.

## 7. NET PROFIT CALCULATIONS

In determining the amount of net profit (or net loss) and charges and expenses covered hereunder

© All rights reserved.
NETWORK INTERRUPTION COVERAGE SECTION

Pl. App. 0037

for the purpose of ascertaining the amount of **Loss** (and otherwise) under this **Network Interruption Coverage Section**, due consideration shall be given to the prior experience of an **Insured's** business before the beginning of the **Security Failure** and to the probable business an **Insured** could have performed had no **Security Failure** occurred.  Provided, however, that such net profit (or net loss) calculations shall not include, and this policy shall not cover, net income that would likely have been earned as a result of an increase in volume of business due to favorable business conditions caused by the impact of **Security Failures** on other businesses.  All such net profit (or net loss) and charges and expenses shall be calculated on an hourly basis and based on such an **Insured's** actual net profit (or net loss) and charges and expenses.

8.  **APPRAISAL**

If any **Insured** and the **Insurer** disagree on the amount of **Loss**, either may make a written demand for an appraisal of such **Loss**.  If such demand is made, each party will select a competent and impartial appraiser.  The appraisers will then jointly select an umpire.  If the appraisers cannot agree on an umpire, they may request that selection be made by a judge of a court having jurisdiction. Each appraiser will separately state the amount of **Loss**.  If they fail to agree, they will submit their differences to the umpire.  A decision agreed to by any two of these three will be binding.

Such **Insured** and the **Insurer** will:

    (1) pay their respective chosen appraiser; and
    (2) bear the expenses of the umpire equally.

Any appraisal of **Loss** shall be calculated in accordance with all terms, conditions and exclusions of this policy.

[The balance of this page is intentionally left blank.]

Pl. App.0038



Specialty Risk Protector®

**Media Content Insurance**
**("MEDIA CONTENT COVERAGE SECTION")**

THIS IS A CLAIMS MADE AND REPORTED COVERAGE SECTION AND A THIRD PARTY COVERAGE SECTION

<u>Notice</u>: Pursuant to Clause 1 of the **General Terms and Conditions**, the **General Terms and Conditions** are incorporated by reference into, made a part of and are expressly applicable to this **Media Content Coverage Section**, unless otherwise explicitly stated to the contrary in the **General Terms and Conditions** or in this **Media Content Coverage Section**.

**1. INSURING AGREEMENTS**

With respect to the **MEDIA CONTENT INSURING AGREEMENT**, the **DEFENSE** provisions and the **SETTLEMENT** provisions of this Clause 1., solely with respect to **Claims** first made against an **Insured** during the **Policy Period** or **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy, this **Media Content Coverage Section** affords the following coverage:

**MEDIA CONTENT INSURING AGREEMENT**

The **Insurer** shall pay on an **Insured's** behalf all **Loss** in excess of the applicable Retention that such **Insured** is legally obligated to pay resulting from a **Claim** alleging a **Wrongful Act**.

**DEFENSE**

(a) The **Insurer** has the right and duty to defend a **Suit** for a **Wrongful Act**, even if the **Suit** is groundless, false or fraudulent.

(b) The **Insurer** has the right to investigate any **Claim**.

(c) The **Insurer's** duty to defend ends if an **Insured** refuses to consent to a settlement that the **Insurer** recommends pursuant to the **SETTLEMENT** provision below and that the claimant will accept. As a consequence of such **Insured's** refusal, the **Insurer's** liability shall not exceed the amount for which the **Insurer** could have settled such **Claim** had such **Insured** consented, plus **Defense Costs** incurred prior to the date of such refusal, plus 50% of **Defense Costs** incurred with the **Insurer's** prior written consent after the date of such refusal. This Clause shall not apply to any settlement where the total incurred **Loss** does not exceed the applicable Retention amount.

**SETTLEMENT**

(a) The **Insurer** has the right, with the written consent of an **Insured**, to settle any **Claim** if the **Insurer** believes that it is proper.

(b) An **Insured** may settle any **Claim** on behalf of all **Insureds** to which this insurance applies and

<span style="color:red">Pl. App.0039</span>

101019 (12/13)                     Page 1 of 7                     © All rights reserved.
MEDIA CONTENT COVERAGE SECTION (CLAIMS MADE)

which are subject to one Retention amount where the total incurred **Loss** does not exceed the Retention amount.

**2. DEFINITIONS**

(a) **"Bodily Injury"** means physical injury, sickness or disease, and, if arising out of the foregoing, mental anguish, mental injury, shock, humiliation or death at any time.

(b) **"Claim"** means:

    (1) a written demand for money, services, non-monetary relief or injunctive relief;
    (2) a written request for mediation or arbitration, or to toll or waive an applicable statute of limitations; or
    (3) a **Suit.**

(c) **"Defense Costs"** means all reasonable and necessary fees charged by an attorney appointed by the **Insurer** (unless otherwise provided for by this policy) in connection with any **Suit** brought against an **Insured** alleging a **Wrongful Act**, as well as all other reasonable and necessary fees, costs and expenses (including premiums for any appeal bond, attachment bond or similar bond arising out of a covered judgment, but without any obligation to apply for or furnish any such bond) incurred in the defense or investigation of a **Claim** by the **Insurer** or by an **Insured** with the **Insurer's** written consent. **Defense Costs** shall not include: (i) compensation of any natural person **Insured**; or (ii) any fees, costs or expenses incurred prior to the time that a **Claim** is first made against an **Insured.**

(d) **"Insured"** means:

    (1) a **Company;**
    (2) any past, present or future officer, director, trustee or employee of a **Company** (and in the event that a **Company** is a partnership, limited liability partnership or limited liability company, then any general or managing partner or principal thereof), but only while acting within the scope of his or her duties in connection with the provision of **Material** for such **Company;**
    (3) any independent contractors, agents, third-party distributors, licensees and sub-licensees, but only:
        (i) with respect to **Material** that they provide to a **Company;** and
        (ii) when such **Company** has, prior to the commission of a **Wrongful Act**, expressly agreed in writing to indemnify and defend such party against liability arising out of such **Wrongful Act;**
    (4) any person or entity that a **Company** has expressly agreed in writing, prior to the commission of a **Wrongful Act**, to add as an **Insured** under this policy, but only for the **Wrongful Acts** of a **Company;** and
    (5) any other person or entity listed as **Insured** by endorsement to this policy, but only for the **Wrongful Acts** of a **Company.**

(e) **"Loss"** means compensatory damages, judgments, settlements, pre-judgment and post-judgment interest and **Defense Costs**, including punitive, exemplary and multiple damages where insurable by the applicable law which most favors coverage for such punitive, exemplary and multiple damages.

<span style="color:red">Pl. App.0040</span>

101019 (12/13)        Page 2 of 7        © All rights reserved.

MEDIA CONTENT COVERAGE SECTION (CLAIMS MADE)

(f) **"Material"** means media content in any form, including, without limitation, advertising and written, printed, video, electronic, digital or digitized content, of:

(1) broadcasts, including without limitation, broadcasts via television, motion picture, cable, satellite television, radio, wireless devices or the Internet; or

(2) publications, including without limitation, publications via newspaper, newsletter, magazine, book and other literary, monograph, brochure, directory, screen play, film script, playwright and video publications.

(g) **"Pollutants"** means, but is not limited to, any solid, liquid, gaseous, biological, radiological or thermal irritant or contaminant, including smoke, vapor, dust, fibers, mold, spores, fungi, germs, soot, fumes, acids, alkalis, chemicals and waste. "Waste" includes, but is not limited to, materials to be recycled, reconditioned or reclaimed and nuclear materials.

(h) **"Property Damage"** means damage to, loss of use of or destruction of any tangible property. For purposes of this definition, "tangible property" shall not include electronic data.

(i) **"Suit"** means a civil proceeding for monetary, non-monetary or injunctive relief, which is commenced by service of a complaint or similar pleading. **Suit** includes a binding arbitration proceeding to which an **Insured** must submit or does submit with the **Insurer's** consent.

(j) **"Third Party Event"** means any **Wrongful Act.**

(k) **"Wrongful Act"** means any act, error, omission, negligent supervision of an employee, misstatement or misleading statement by an **Insured** in connection with **Material** occurring on or after the **Retroactive Date** and prior to the end of the **Policy Period** (including without limitation, any of the foregoing conduct in the gathering, collection, broadcast, creation, distribution, exhibition, performance, preparation, printing, production, publication, release, display, research, or serialization of **Material** by an **Insured**) that results solely in:

(1) infringement of copyright, title, slogan, trademark, trade name, trade dress, mark, service mark, service name, infringement of domain name, deep-linking or framing, including, without limitation, unfair competition in connection with such conduct;

(2) plagiarism, piracy or misappropriation or theft of ideas under implied contract or other misappropriation or theft of ideas or information; including, without limitation, unfair competition in connection with such conduct;

(3) invasion, infringement or interference with rights of privacy or publicity, false light, public disclosure of private facts, intrusion and commercial appropriation of name, persona or likeness; including, without limitation, emotional distress or mental anguish in connection with such conduct;

(4) defamation, libel, slander, product disparagement or trade libel or other tort related to disparagement or harm to character or reputation; including, without limitation, unfair competition, emotional distress or mental anguish in connection with such conduct;

(5) wrongful entry or eviction, trespass, eavesdropping or other invasion of the right to private occupancy, or false arrest, detention or imprisonment or malicious prosecution; including, without limitation, any emotional distress or mental anguish in connection with such conduct; or

(6) negligent or intentional infliction of emotional distress, outrage or *prima facie* tort in connection with **Material.**

<span style="color:red">Pl. App. 0041</span>

101019 (12/13)

© All rights reserved.

MEDIA CONTENT COVERAGE SECTION (CLAIMS MADE)

## 3. EXCLUSIONS

This policy shall not cover **Loss** in connection with a **Claim** made against an **Insured**:

(a) alleging, arising out of, based upon or attributable to a dishonest, fraudulent, criminal or malicious act, error or omission, or any intentional or knowing violation of the law; provided, however, the **Insurer** will defend **Suits** that allege any of the foregoing conduct, and that are not otherwise excluded, until there is a final, non-appealable judgment or adjudication against an **Insured** as to such conduct in any action or proceeding other than an action or proceeding initiated by the **Insurer** to determine coverage under this policy, at which time the **Insureds** shall reimburse the **Insurer** for **Defense Costs.**

(b) alleging, arising out of, based upon or attributable to any misappropriation of trade secret or infringement of patent.

(c) alleging, arising out of, based upon or attributable to any (1) presence of **Pollutants,** (2) the actual or threatened discharge, dispersal, release or escape of **Pollutants,** or (3) direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, or in any way respond to or assess the effects of **Pollutants.**

(d) alleging, arising out of, based upon or attributable to any **Bodily Injury** or **Property Damage.**

(e) alleging, arising out of, based upon or attributable to any:

    (1) fire, smoke, explosion, lightning, wind, water, flood, earthquake, volcanic eruption, tidal wave, landslide, hail, act of God or any other physical event, however caused;
    (2) strikes or similar labor action, war, invasion, military action (whether war is declared or not), civil war, mutiny, civil commotion, popular or military uprising, insurrection, rebellion, revolution, military or usurped power, or any action taken to hinder or defend against any of these events;
    (3) electrical or mechanical failures of infrastructure not under the control of an **Insured,** including any electrical power interruption, surge, brownout or blackout;
    (4) failure of telephone lines, data transmission lines or other telecommunications or networking infrastructure not under the control of an **Insured;** or
    (5) satellite failure.

(f) alleging, arising out of, based upon or attributable to any:

    (1) purchase, sale, or offer or solicitation of an offer to purchase or sell securities;
    (2) violation of any securities law, including the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, or any regulation promulgated under the foregoing statutes, or any federal, state or local laws similar to the foregoing statutes (including "Blue Sky" laws), whether such law is statutory, regulatory or common law;
    (3) violation of the Organized Crime Control Act of 1970 (commonly known as Racketeer Influenced And Corrupt Organizations Act, or "RICO"), as amended, or any regulation promulgated thereunder or any federal, state or local law similar to the foregoing, whether such law is statutory, regulatory or common law;
    (4) antitrust violations, restraint of trade, unfair competition, or violations of the Sherman Act, Clayton Act or the Robinson-Patman Act, as amended; provided, however, that this

<span style="color:red">Pl. App.0042</span>

MEDIA CONTENT COVERAGE SECTION (CLAIMS MADE)

exclusion shall not apply to unfair competition as referenced in sub-paragraphs (1), (2) or (4) of the definition of **Wrongful Act**; or

(5) violation of the Telephone Consumer Protection Act of 1991, as amended.

(g) alleging, arising out of, based upon or attributable to an **Insured's** employment of any individual or any of an **Insured's** employment practices (including, without limitation, wrongful dismissal, discharge or termination, discrimination, harassment, retaliation or other employment-related claim).

(h) alleging, arising out of, based upon or attributable to any unfair or deceptive business practices, including, without limitation, violations of any local, state or federal consumer protection laws; provided, however, this exclusion shall not apply to **Claims** in connection with the collection of **Material**.

(i) brought by or on behalf of:

(1) any **Insured**;
(2) any business entity that is controlled, managed or operated, directly or indirectly, in whole or in part, by an **Insured**; or
(3) any parent company, **Subsidiary**, successor or assignee of an **Insured**, or any person or entity affiliated with an **Insured** or such business entity through common **Management Control**;

provided, however, this exclusion shall not apply to an **Insured** as described in Sub-paragraph (d)(4) or (d)(5) of the definition of **Insured**.

(j) for any of the following:

(1) the return of an **Insured's** fees or compensation;
(2) any profit or advantage to which an **Insured** is not legally entitled;
(3) an **Insured's** expenses or charges, including employee compensation and benefits, overhead, over-charges or cost over-runs;
(4) civil or criminal fines or penalties imposed against an **Insured** and any matters deemed uninsurable under the law pursuant to which this policy shall be construed;
(5) an **Insured's** costs and expenses of complying with any injunctive or other form of equitable relief;
(6) taxes incurred by an **Insured**;
(7) the amounts for which an **Insured** is not financially liable or which are without legal recourse to any **Insured**;
(8) production costs or the cost of recall, reproduction, reprinting, return or correction of **Material** by any person or entity; or
(9) amounts an **Insured** agrees to pay pursuant to a contract, including without limitation, liquidated damages, setoffs or penalties.

(k) alleging, arising out of, based upon or attributable to any obligation that an **Insured** has under a contract, other than liability from a **Wrongful Act** where such liability has been assumed by an **Insured** in the form of a written hold harmless or indemnity agreement that predates the first such **Wrongful Act**.

<span style="color:red">PI. App. 0043</span>

101019 (12/13)                     Page 5 of 7                     © All rights reserved.

(l) alleging, arising out of, based upon or attributable to any **Wrongful Acts**, or any **Related Acts** thereto, alleged or contained in any **Claim** which has been reported, or in any circumstances of which notice has been given, under any policy of which this **Media Content Coverage Section** is a renewal or replacement or which it may succeed in time.

(m) alleging, arising out of, based upon or attributable to any **Wrongful Act** occurring prior to the **Retroactive Date** or any **Related Act** thereto, regardless of when such **Related Act** occurs.

(n) alleging, arising out of, based upon or attributable to any **Wrongful Act** occurring prior to the **Continuity Date**, or any **Related Act** thereto (regardless of when such **Related Act** occurs), if, as of the **Continuity Date**, an **Insured** knew or could have reasonably foreseen that such **Wrongful Act** did or would result in a **Claim** against such **Insured**.

(o) alleging, arising out of, based upon or attributable to any breach of fiduciary duty, responsibility, or obligation in connection with any employee benefit or pension plan, including violations of the responsibilities, obligations or duties imposed upon fiduciaries by the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, or similar statutory or common law of the United States of America or any state or jurisdiction therein.

(p) alleging, arising out of, based upon or attributable to (1) false advertising or misrepresentation in advertising of an **Insured's** products or services, (2) any failure of goods, products or services to conform with an advertised quality or performance, or (3) any infringement of trademark or trade dress by any goods, products or services, including any goods or products displayed or contained in any **Material**.

(q) brought by or on behalf of: (i) ASCAP, SESAC, BMI, RIAA or other music licensing organizations; (ii) the Federal Trade Commission; (iii) the Department of Health and Human Services or Office of Civil Rights; (iv)  the Federal Communications Commission; or (v) any other federal, state, local or foreign government, agency or office.

(r) brought by or on behalf of any independent contractor, third-party distributor, licensee, sub-licensee, joint venturer, venture partner, any employee of the foregoing, or any employee or agent of an **Insured** alleging, arising out of, based upon or attributable to disputes over the (i) ownership or exercise of rights in **Material;** or (ii) services supplied by such independent contractor, third-party distributor, licensee, sub-licensee, joint venturer, venture partner or employee or agent.

(s) alleging, arising out of, based upon or attributable to any infringement of copyright related to software, source code or software license; provided, however, that this exclusion shall not apply to any otherwise covered **Claim** alleging an infringement of copyright, trademark or servicemark with respect to **Material** generated or displayed in a publication or broadcast by the use of software.

(t) alleging, arising out of, based upon or attributable to the failure to protect information used for authenticating or identifying an **Insured's** customers, vendors, suppliers or independent contractors in the normal course of an **Insured's** business.

(u) alleging, arising out of, based upon or attributable to any:

<span style="color:red">Pl. App.0044</span>

(1) accounting or recovery of profits, royalties, fees or other monies claimed to be due from an **Insured**, or any **Claim** brought by any such party against an **Insured** claiming excessive or unwarranted fees, compensation or charges of any kind made by an **Insured**; or

(2) licensing fees or royalties ordered, directed or agreed to be paid by an **Insured** pursuant to a judgment, arbitration award, settlement agreement or similar order or agreement, for the continued use of a person or entity's copyright, title, slogan, trademark, trade name, trade dress, service mark, service name, or other intellectual property right.

[The balance of this page is intentionally left blank.]

Pl. App 0045

© All rights reserved.

MEDIA CONTENT COVERAGE SECTION (CLAIMS MADE)

ENDORSEMENT# *1*

This endorsement, effective at *12:01 am    June 1, 2016*          forms a part of
Policy number *01-424-32-51*
Issued to: *SOUTHWEST AIRLINES CO.*

By: *Illinois National Insurance Company*

### ECONOMIC SANCTIONS ENDORSEMENT

*This endorsement modifies insurance provided under the following:*

Coverage shall only be provided and payment of loss under this policy shall only be made
in full compliance with enforceable United Nations economic and trade sanctions and the
trade and economic sanction laws or regulations of the European Union and the United
States of America, including, but not limited to, sanctions, laws and regulations
administered and enforced by the U.S. Treasury Department's Office of Foreign Assets
Control ("OFAC").

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

Pl.App.0046
® All rights reserved.

*END 001*

**ENDORSEMENT# *2***

This endorsement, effective *12:01 am*      *June 1, 2016*          forms a part of
policy number   *01-424-32-51*
issued to *SOUTHWEST AIRLINES CO.*

by   *Illinois National Insurance Company*

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

AMENDATORY ENDORSEMENT

TEXAS

This endorsement modifies insurance provided under the following:

**Specialty Risk Protector**<sup>SM</sup>

The policy is amended as follows:

1. Clause 9. **DISCOVERY** in the **General Terms and Conditions** is modified to the extent necessary to provide the following:

   The **Automatic Discovery** shall not apply where an **Optional Discovery Period** has been purchased or to **Claims** that are covered under subsequent insurance an **Insured** purchases or that is purchased for an **Insured's** benefit as a renewal of or replacement for this policy, or that would be covered by subsequent insurance that is purchased as a renewal of or replacement for this policy but for the exhaustion of the amount of insurance applicable to such **Claims** or any applicable Retention amount.

2. Clause 15. **DISPUTE RESOLUTION PROCESS** in the **General Terms and Conditions** is modified to the extent necessary to provide the following:

   The non-binding mediation shall be commenced in the state indicated in Item 1 of the Declarations as the mailing address for the **Named Entity**; provided, however, that the **Named Entity** and the **Insurer** can mutually agree that the non-binding mediation may be commenced in New York, New York; Atlanta, Georgia; Chicago, Illinois; or Denver, Colorado.

3. Clause 5. **REPUTATION THREAT OR REPUTATION ATTACK TERMS AND CONDITIONS**, paragraph (2) of the *Right to Void Coverage* section, in the **ReputationGuard Coverage Section**, if purchased, is deleted in its entirety and replaced by the following:

◊ All rights reserved.
*END 002*

<span style="color:red">Pl. App.0047</span>

ENDORSEMENT# *2*

    (2) any **Insured** had knowledge of any fact or information as of the **Continuity Date** that would lead a reasonable person to believe that a **Reputation Threat** or **Reputation Attack** may occur during the **Policy Period.**

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© All rights reserved.

Pl. App. 048

110646 (5/14)                               Page 2 of 2

ENDORSEMENT# *3*

This endorsement, effective *12:01 am*     *June 1, 2016*          forms a part of
policy number  *01-424-32-51*
issued to *SOUTHWEST AIRLINES CO.*

by     *Illinois National Insurance Company*

**TEXAS AMENDATORY ENDORSEMENT**
**CANCELLATION AND NONRENEWAL**

Wherever used in this endorsement: 1)"Insurer" means the insurance company which issued this policy; and 2) "Insured" means the Named Corporation, Named Organization, Named Sponsor, or Named Insured stated in the declarations page; and 3) "Liability insurance" means the following types of insurance: general liability, professional liability other than medical professional liability, commercial multi-peril coverage, and any other types of lines of liability insurance designated by the State Board of Insurance.

It is hereby agreed that the cancellation provision of this policy is deleted in its entirety and replaced by the following:

**CANCELLATION AND NONRENEWAL**

A.    Cancellation

    1.    This policy may be canceled by the Insured by surrender thereof to the Insurer or any of its authorized agents or by mailing to the Insurer written notice stating when thereafter the cancellation shall be effective.

    2.    Except as provided by subsection A.3. below, the Insurer may not cancel this policy if it is:

        a) a policy of liability insurance that is a renewal or continuation policy; or

        b) a policy of liability insurance that is in its initial policy period after the 60th day following the date on which the policy was issued.

    3.    The Insurer may cancel this policy at any time during the term of the policy for the following reasons:

        a) fraud in obtaining coverage;

        b) failure to pay premiums when due;

        c) an increase in hazard within the control of the Insured or Other Insured(s) which would produce an increase in rate;

        d) loss of the Insurer's reinsurance covering all or part of the risk covered by the policy; or

© All rights reserved.

Pl. App. 0049

**ENDORSEMENT# _3_**   (continued)

e) the Insurer being placed in supervision, conservatorship, or receivership, if the cancellation or nonrenewal is approved or directed by the supervisor, conservator, or receiver.

4.   The Insurer shall deliver or mail to the Insured first named in the Declarations written notice of cancellation at the address shown on the policy not less than the 10th day before the date on which the cancellation takes effect. Such written notice shall state the reasons(s) for cancellation.

5.   The Insurer may not cancel this policy based solely on the fact that the Insured is an elected official.

6.   If this policy provides property coverage or general liability coverage under a commercial property, commercial general liability, commercial multi-peril or business owner policy, and covers a condominium association, and the condominium Property contains at least one residence or the condominium declarations conform with the Texas Uniform Condominium Act, then the notice of cancellation, as described above, will be provided to the First Named Insured thirty (30) days before the effective date of cancellation. The Insurer will also provide thirty (30) days written notice to each unit-owner to whom the Insurer issued a certificate or memorandum of insurance, by mailing or delivering the notice to each last mailing address known to the Insurer.

B. Nonrenewal

1.   The Insurer may refuse to renew this policy by delivering or mailing to the Insured first named in the Declarations written notice of nonrenewal at the address shown on the policy. Such written notice shall state the reason(s) for nonrenewal. The notice must be delivered or mailed not later than the 60th day before the date on which the policy expires. If the notice is delivered or mailed later than the 60th day before the date on which the policy expires, the coverage shall remain in effect until the 61 day after the date on which the notice is delivered or mailed. If notice is delivered or mailed, proof of delivery or mailing will be sufficient proof of notice. Earned premium for any period of coverage that extends beyond the expiration date of the policy shall be computed pro rata based on the previous year's rates.

2.   The transfer of a policyholder between admitted companies within the same insurance group is not considered a refusal to renew.

3.   The Insurer may not refuse to renew this policy based solely on the fact that the Insured is an elected official.

4.   If this policy provides property coverage or general liability coverage under a commercial property, commercial general liability, commercial multi-peril or business owner policy, and covers a condominium association, and the

© All rights reserved  Pl. App. 0050 END 003

<u>**ENDORSEMENT#** *3*</u>   (continued)

condominium property contains at least one residence or the condominium declarations conform with the Texas Uniform Condominium Act, then the Insurer will mail or deliver written notice of nonrenewal, at least thirty (30) days before the expiration or anniversary date of the policy, to:

a.   The first Named Insured; and

b.   Each unit-owner to whom the Insurer issued a certificate or memorandum of insurance.

The Insurer will mail or deliver such notice to each last mailing address known to the Insurer.

All other terms, conditions and exclusions of the policy shall remain unchanged.

_____

AUTHORIZED REPRESENTATIVE

◊ All rights reserved.

*END 003*

Pl. App.0051

74802 (7/11)

3

ENDORSEMENT# *4*

This endorsement, effective *12:01 am   June 1, 2016*           forms a part of
Policy number *01-424-32-51*
Issued to: *SOUTHWEST AIRLINES CO.*

By:     *Illinois National Insurance Company*

**CYBEREDGE LOSS PREVENTION SERVICES ENDORSEMENT**

In consideration of your purchase of this policy, it is hereby understood and agreed that the
**Named Entity** is eligible to:

(1) subscribe to the CyberEdge RiskTool and AutoShun® loss control services; and
(2) receive an IBM infrastructure vulnerability scan.

The **Named Entity** can begin the process of registering and activating the CyberEdge
RiskTool, AutoShun and/or IBM vulnerability scan by visiting the following site:
www.aig.com/cyberedgeregistration .

CyberEdge RiskTool is a web-based platform that can assist in streamlining a company's
risk management process.  CyberEdge RiskTool is pre-populated with training modules to
aid in educating staff on security protocols and preventing human error which might cause
future security breaches.  The platform is also customizable and can be tailored to a
business's risk management needs.

AutoShun is a device designed to provide an additional layer of security against various
forms of malware.  The AutoShun thwarts attacks by blocking inbound and outbound
communications with known "bad" IP addresses.  AutoShun works with RiskTool to
provide the user with real time information on blocked IP addresses.

The IBM vulnerability scan is a remote search of the **Named Entity's** web-facing external
infrastructure, including up to 49 public-facing IP addresses.  The scan identifies and
prioritizes potential vulnerabilities that could be exploited by a remote hacker and provides
the **Named Entity** with a report which identifies threats and suggests responses.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.



—————————————————————
AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 004*
Pl. App.0052
Page 1 of 1

113428 (2/14)

ENDORSEMENT# *5*

This endorsement, effective  *12:01 am*      *June 1, 2016*                 forms a part of
policy number  *01-424-32-51*
issued to   *SOUTHWEST AIRLINES CO.*

by    *Illinois National Insurance Company*

## CANCELLATION AMENDATORY
## (RETURN PRO RATA)

Wherever used herein: (1) "Policy" means the policy or bond to which this endorsement or rider is made part of; (2)"Insurer" means the "Insurer," "Underwriter," "Company" or other name specifically ascribed in this Policy as the insurance company or underwriter for this Policy; (3) "Company" means the "Named Entity," "Named Corporation," Named Organization," "Named Sponsor," "Named Insured," "First Named Insured," "Insured's Representative," "Policyholder" or equivalent term stated in Item 1 of the Declarations; and (4) "Period" means the "Policy Period," "Bond Period" or equivalent term stated in the Declarations.

In consideration of the premium charged, it is hereby understood and agreed that notwithstanding anything to the contrary in any CANCELLATION or TERMINATION clause of this Policy (and any endorsement or rider amending such cancellation or termination clause, including but not limited to any state cancellation/non-renewal amendatory attached to this policy), if this Policy shall be canceled by the Company, the Insurer shall return to the Company the unearned pro rata proportion of the premium as of the effective date of cancellation.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

Pl.App.0053

© All rights reserved.

101036 (04/09)                    *END 5*

<u>ENDORSEMENT#</u> *6*

This endorsement, effective *12:01 am*      *June 1, 2016*          forms a part of
policy number    *01-424-32-51*
issued to *SOUTHWEST AIRLINES CO.*

by     *Illinois National Insurance Company*

**CHOICE OF PANEL COUNSEL ENDORSEMENT**

This endorsement modifies insurance provided under the following:

    **Specialty Risk Protector®**
    **General Terms and Conditions**

In consideration of the premium charged, it is hereby understood and agreed that the policy is amended as follows:

A.    With regard to any **Claim** for which an **Insured** seeks coverage, the initial choice of counsel ("**Chosen Counsel**") shall be made by such **Insured** from the **Insurer's** list of panel firms, which list is available upon request by an **Insured**, provided, however, that any and all **Defense Costs** of **Chosen Counsel** shall be paid and satisfied on an ongoing basis by the **Insureds** until all applicable Retention amounts have been satisfied.

B.    With regard to any **Claim** for which an **Insured** seeks coverage, such **Insured** agrees that as a condition precedent to coverage for **Defense Costs** incurred through **Chosen Counsel** in excess of the applicable Retention amount, such **Insured** and **Chosen Counsel** must comply with the **Insurer's** Litigation Management Guidelines (the **"Guidelines"**), which are available upon request by an **Insured**. The **Insureds** understands and agrees that the **Guidelines** contain reasonable and necessary reporting and billing procedures to be followed by **Chosen Counsel**, including, without limitation:

    1.    development of a litigation plan and litigation budget;
    2.    pre-approved rates for services;
    3.    pre-approval by the **Insurer** before designated legal services are provided; and
    4.    the require format for submitting **Defense Costs** to the **Insurer**.

The **Guidelines** also require that **Chosen Counsel** work closely and communicate regularly with the **Insurer's** assigned claims professional in coordinating defense efforts and that **Chosen Counsel** apprise the **Insurer** on a regular and timely basis as to significant case developments.

C.    In the event **Insured(s)** cannot select legal counsel from the list of **Chosen Counsel** due to: (1) no firm is available in the jurisdiction in which such **Claim** is brought; (2) an actual conflict of interest; or (3) other circumstances in which the use of unlisted counsel is both reasonable and necessary, the **Insurer** and the **Insured(s)** shall jointly agree upon counsel who will defend the **Insured(s)** in such matter. If the **Insurer** and the **Insured(s)** are unable to agree upon selection of defense counsel, the **Insurer** shall select defense counsel.

D.    Fees, costs, charges, billings and any other expense incurred through any law firm



© All rights reserved
*END 006*

ENDORSEMENT# *6*    (continued)

or other service provider, other than **Chosen Counsel** or a firm chosen pursuant to paragraph C above, shall not be recoverable under this policy as **Defense Costs** or otherwise.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____

AUTHORIZED REPRESENTATIVE

© All rights reserved
Pl. App. 0055
*END 006*

103452 (11/09)                    Page 2 of 2

ENDORSEMENT# *7*

This endorsement, effective *12:01 am     June 1, 2016*     forms a part of
policy number   *01-424-32-51*
issued to *SOUTHWEST AIRLINES CO.*

by    *Illinois National Insurance Company*

### CONDUCT EXCLUSION AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided under the following:
**Specialty Risk Protector®**
**Security and Privacy Coverage Section**
**Event Management Coverage Section**
**Network Interruption Coverage Section**
**Cyber Extortion Coverage Section**

In consideration of the premium charged, it is hereby understood and agreed that, in
Clause 3. **EXCLUSIONS** of the **Security and Privacy Coverage Section,** the **Event
Management Coverage Section,** the **Network Interruption Coverage Section** and the **Cyber
Extortion Coverage Section,** subparagraph 3(a)(1) is deleted in its entirety and replaced
with the following:

> (1)    past or present directors, officers, trustees, general or managing partners
> or principals (or the equivalent positions), while serving in such capacity
> and whether acting alone or in collusion with other persons; or

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

Pl. App. 0056

111375 (7/12)                    Page 1 of 1

ENDORSEMENT# *8*

This endorsement, effective *12:01 am*     *June 1, 2016*           forms a part of
policy number   *01-424-32-51*
issued to   *SOUTHWEST AIRLINES CO.*

by     *Illinois National Insurance Company*

**CONTROL GROUP DEFINITION AMENDATORY ENDORSEMENT**
**(AMENDING LIST OF OFFICERS; NON-ADMINISTRATIVE PERSONNEL)**

This endorsement modifies insurance provided under the following:

**Specialty Risk Protector®**
**General Terms and Conditions**

In consideration of the premium charged, it is hereby understood and agreed that:

1. In Clause  2. **DEFINITIONS**  of the **General Terms and Conditions**, paragraph  (e), the
   definition of " **Control Group**" is deleted in its entirety and replaced with the following:

   (e)     " **Control Group**" means a **Company's**:

                 Chief Executive Officer;
                 Chief Financial Officer;
                 General Counsel;
                 Risk Manager

   or equivalent positions, regardless of title.

2. In Clause 6. **NOTICE** of the **General Terms and Conditions**, subparagraph (a)(1) is
   deleted in its entirety and replaced with the following:

   (1) any non-administrative personnel in the  office of any member  of the **Control Group**
       first becomes aware of the **Claim**; or

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

PL App 0057
© All rights reserved.

115985 (12/13)               *END 8*

<u>ENDORSEMENT#</u> *9*

This endorsement, effective *12:01 am*     *June 1, 2016*          forms a part of
policy number   *01-424-32-51*
issued to *SOUTHWEST AIRLINES CO.*

by     *Illinois National Insurance Company*

**CRIMINAL REWARD COVERAGE EXTENSION**

This endorsement modifies insurance provided under the following:

**Specialty Risk Protector®**

In consideration of the premium charged, it is hereby understood and agreed that the policy is amended as follows:

1.  The terms, conditions, exclusions and other limitations set forth in this endorsement are solely applicable to coverage afforded by this endorsement, and do not modify the terms, conditions, exclusions and other limitations contained in the policy unless specifically set forth herein. Unless otherwise set forth herein, the terms, conditions, exclusions and other limitations contained in the policy apply to the coverage provided by this endorsement.

2.  **CRIMINAL REWARD INSURING AGREEMENT**

    The **Insurer** may pay on an **Insured's** behalf, at the **Insurer's** sole and absolute discretion, up to fifty thousand dollars ($50,000), in the aggregate, as a **Criminal Reward Fund**. No Retention shall apply to this coverage.

3.  Solely with respect to the coverage afforded under this endorsement, "**Criminal Reward Fund**" means any amount offered by the **Insurer** for information that leads to the arrest and conviction of any individual(s) committing or trying to commit any illegal act related to the coverage afforded by any **Coverage Section** of this policy.

4.  The **Insurer** shall not pay any **Criminal Reward Fund** for, and this policy shall not cover any amount based upon, any information provided by any **Insured**, an **Insured's** auditors, whether internal or external, any individual hired or retained to investigate the aforementioned illegal acts, or any other individuals with responsibilities for the supervision or management of the aforementioned individuals.

5.  All exclusions applicable to **Loss** under the **SPL Coverage Section**, **Security and Privacy Coverage Section**, the **Network Interruption Coverage Section**, or the **Event Management Coverage Section** (to the extent any such **Coverage Sections** are purchased) shall apply to the **Criminal Reward Fund** and the coverage afforded under this endorsement.

6.  Solely with respect to the coverage afforded under this endorsement, Clause 4. **LIMIT OF LIABILITY** of the **General Terms and Conditions** is amended to include the following paragraph at the end thereof:

    CR(a)   The **Insurer's** maximum payment as a **Criminal Reward Fund** arising from any and all events occurring during the **Policy Period**, in the aggregate, regardless of the number of events, incidents or **Claims** or amount of **Loss** reported during the **Policy Period**, shall be $50,000. The **Criminal Reward Fund** shall be in addition to, and is not part of, the **Limit of Liability**.

© All rights reserved.


*END 009*

<u>ENDORSEMENT#</u> *9*    (continued)

7.   There shall be no **Retention** applicable to the coverage afforded by this endorsement.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 009*

Pl. App. 0059

105567 (5/10)                    Page 2 of 2

**ENDORSEMENT# *10***

This endorsement, effective *12:01 am*     *June 1, 2016*          forms a part of
policy number  *01-424-32-51*
issued to *SOUTHWEST AIRLINES CO.*

by    *Illinois National Insurance Company*

**CYBERTERRORISM COVERAGE ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**Specialty Risk Protector
Security and Privacy Coverage Section
Event Management Coverage Section
Network Interruption Coverage Section**

In consideration of the premium charged, it is hereby understood and agreed that, in each purchased **Coverage Section** listed above and in Item 6 of the Declarations, the definition of **"Security Failure"** is amended to include the following at the end thereof:

   **"Security Failure"** includes any such failure or violation resulting from **Cyberterrorism**.

For purposes of this endorsement, **"Cyberterrorism"** means the premeditated use of disruptive activities against any computer system or network by an individual or group of individuals, or the explicit threat by an individual or group of individuals to use such activities, with the intention to cause harm, further social, ideological, religious, political or similar objectives, or to intimidate any person(s) in furtherance of such objectives. **"Cyberterrorism"** does not include any such activities which are part of or in support of any military action, war or warlike operation.

   ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.

Pl. App. 0060

117895 (5/14)                    Page 1 of 1

**ENDORSEMENT# *11***

This endorsement, effective *12:01 am     June 1, 2016*                forms a part of
policy number   *01-424-32-51*
issued to *SOUTHWEST AIRLINES CO.*

by      *Illinois National Insurance Company*

### E-DISCOVERY CONSULTANT SERVICES COVERAGE ENDORSEMENT

This endorsement modifies insurance provided under the following:

    **Specialty Risk Protector®**
    **General Terms and Conditions**

In consideration of the premium charged, it is hereby understood and agreed that a **Company** may elect coverage for **E-Discovery Consultant Services**. To provide such coverage, this policy is amended as follows:

1. **E-DISCOVERY CONSULTANT SERVICES COVERAGE**

    The **Insurer** shall pay on a **Company's** behalf, the **E-Discovery Loss** of such **Company** arising from a **Suit** made against any **Insured** for a covered **Third Party Event**, for which **E-Discovery** is required or becomes necessary.

    A **Company** may select a pre-approved **E-Consultant Firm** to perform **E-Discovery Consultant Services**, without further approval by the **Insurer**, at such time that it becomes necessary for such **Company** (or a natural person **Insured** employed by or affiliated with such **Company**) to respond to a discovery request.

    Coverage for **E-Discovery Loss**, up to the **E-Discovery Sublimit of Liability**, shall not be subject to any Retention amount, provided that payment of any **E-Discovery Loss** pursuant to this endorsement shall not waive any rights of the **Insurer** under this policy or at law.

2. Clause 4. **LIMIT OF LIABILITY** of the **General Terms and Conditions** is amended by adding the following paragraphs to the end thereof:

    The **Insurer's** maximum liability for all **E-Discovery Loss**, in the aggregate, arising from all **Suits** covered under this policy, shall be $25,000 (the "**E-Discovery Sublimit of Liability**"). This **E-Discovery Sublimit of Liability** shall be part of and not in addition to the **Limit of Liability** and will in no way serve to increase the **Limit of Liability**.

    **E-Discovery Consultant Services** shall conclude once such services are no longer required or necessary or when the **E-Discovery Sublimit of Liability** has been exhausted, whichever comes first.

◊ All rights reserved.

*END 001*

Pl. App.0061

<u>ENDORSEMENT# *11*</u>   (continued)

It is further understood and agreed that the coverage provided under this endorsement shall not waive the **Insurer's** obligation to pay **Defense Costs** (inclusive but not limited to **Defense Costs** for **E-Discovery Consultant Services**) subject to all other terms, conditions and exclusions of this policy, including any purchased **Coverage Sections**.

3. Solely with respect to the coverage afforded by this endorsement, the following definitions shall apply:

    (a) **"E-Consultant Firm"** means any firm on the **Insurer's** list of approved firms. The list of approved **E-Consultant Firms** is accessible at <u>http://www.aig.com/us/panelcounseldirectory</u> by clicking on the link for "e-Consultant Panel Members."

    (b) **"E-Discovery"** means the development, collection, storage, organization, cataloging, preservation and/or production of electronically stored information.

    (c) **"E-Discovery Loss"** means the reasonable and necessary consulting fees for the **E-Discovery Consultant Services** provided solely to a **Company** by an **E-Consultant Firm**. Provided, however, **E-Discovery Loss** shall not include any costs of discovery other than **E-Discovery Loss**.

    (d) **"E-Discovery Consultant Services"** means solely the following services performed by an **E-Consultant Firm**:
      1. assisting the **Insured** with managing and minimizing the internal and external costs associated with **E-Discovery**;
      2. assisting the **Insured** in developing an **E-Discovery** strategy which may include interviewing qualified and cost effective **E-Discovery** vendors; and
      3. serving as project manager, advisor and/or consultant to the **Insured**, defense counsel and the **Insurer** in executing and monitoring the **E-Discovery** strategy. **E-Discovery Consultant Services** also includes any other services provided by the **E-Consultant Firm** that the **Insured**, **Insurer** and **E-Consultant Firm** agree are reasonable and necessary given the circumstances of a **Suit**.

4. Clause 5. **RETENTION** of the **General Terms and Conditions** is amended to include the following provision at the end thereof:

    No Retention shall apply to **E-Discovery Loss** covered under this endorsement.

    ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

◊ All rights reserved.

Pl. App. 0062

107376 (11/10)                    2

**ENDORSEMENT# *12***

This endorsement, effective *12:01 am*     *June 1, 2016*          forms a part of
policy number  *01-424-32-51*
issued to   *SOUTHWEST AIRLINES CO.*

by     *Illinois National Insurance Company*

### EVENT MANAGEMENT SCHEDULED VENDOR ENDORSEMENT

**This endorsement amends the Event Management Coverage Section.**

In consideration of the premium charged, it is hereby understood and agreed that the
vendor(s) listed below in the Schedule of Approved Event Management Vendors are
approved by the **Insurer** to provide the services specified for such vendor(s).

SCHEDULE OF APPROVED EVENT MANAGEMENT VENDORS

| SERVICES | VENDOR(S) |
|---|---|
| Investigation Services as described in subparagraph (1) of the definition of **Loss** | NONE SCHEDULED |
| Public Relation/Crisis Management Services as described in subparagraph (2) of the definition of **Loss** | NONE SCHEDULED |
| Legal Services as described in subparagraph (2) of the definition of **Loss** | Baker & Hostetler LLP<br>811 Main Street<br>Suite 1100<br>Houston, TX 77002-6111 |
| Notification Services as described in subparagraph (3) of the definition of **Loss** | NONE SCHEDULED |
| Post-Breach Victim Services as described in subparagraph (4) of the definition of **Loss** | NONE SCHEDULED |
| Electronic Data Services as described in subparagraphs (6) and (7) of the definition of **Loss** | NONE SCHEDULED |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

Pl. App. 0063
® All rights reserved.

118110 (08/14)          *END 12*

<u>ENDORSEMENT#</u> *13*

This endorsement, effective *12:01 am*      *June 1, 2016*         forms a part of
policy number   *01-424-32-51*
issued to *SOUTHWEST AIRLINES CO.*

by      *Illinois National Insurance Company*

**NOTICE OF CLAIM PROVISION AMENDATORY ENDORSEMENT**
**(SIXTY- DAY POST POLICY REPORTING PERIOD)**

**This endorsement amends the General Terms and Conditions.**

In consideration of the premium charged, it is hereby understood and agreed that in
Clause 6. **NOTICE**, Paragraph (a), the second paragraph is deleted in its entirety and
replaced with the following:

Notwithstanding the foregoing and regardless of whether any personnel described in
(1) above has become aware, in all events each **Claim** under a **Claims- Made and
Reported Coverage Section** must be reported no later than either:

(1)   sixty (60) days after the end of the **Policy Period**; or
(2)   the end of any applicable **Discovery Period**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© All rights reserved

PI App 0064

*END 013*

103456 (11/09)                          Page 1 of 1

ENDORSEMENT# *14*

This endorsement, effective at *12:01 am*    *June 1, 2016*          forms a part of
Policy number *01-424-32-51*
Issued to: *SOUTHWEST AIRLINES CO.*

By: *Illinois National Insurance Company*

**RETENTION AMENDATORY ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**Specialty Risk Protector®**
**General Terms and Conditions**

In consideration of the premium charged, it is hereby understood and agreed that in Clause
5. RETENTION of the General Terms and Conditions, paragraphs (a), (b) and (c) are deleted
in their entirety and replaced with the following

If a **First Party Event** or a **Third Party Event** and any **Related Acts** trigger coverage
under more than one **Coverage Section,** the highest applicable Retention amount
shall apply to all **Loss** arising out of such **First Party Event** or **Third Party Event**  and
all **Related Acts.**

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved
*END 014*

105565 (5/10)                          Page 1 of 1

**ENDORSEMENT# *15***

This endorsement, effective *12:01 am*      *June 1, 2016*            forms a part of
policy number   *01-424-32-51*
issued to *SOUTHWEST AIRLINES CO.*

by    *Illinois National Insurance Company*

**SECURITY FAILURE DEFINITION AMENDATORY ENDORSEMENT
(PHYSICAL THEFT OF HARDWARE)**

This endorsement modifies insurance provided under the following:
    **Specialty Risk Protector®**
    **Security and Privacy Coverage Section**

In consideration of the premium charged, it is hereby understood and agreed that in Clause
2. **DEFINITIONS** of the **Security and Privacy Coverage Section**, paragraph (p), the definition
of "**Security Failure**" is amended to include the following:

> "**Security Failure**" also means the physical theft of hardware controlled by a
> **Company** (or components thereof) on which electronic data is stored, by a person
> other than an **Insured**, from a premises occupied and controlled by a **Company**,
> occurring on or after the **Retroactive Date** and prior to the end of the **Policy Period**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

®All rights reserved.

Pl. App. 0066

### ENDORSEMENT# *16*

This endorsement, effective *12:01 am*      *June 1, 2016*          forms a part of
policy number   *01-424-32-51*
issued to *SOUTHWEST AIRLINES CO.*

by    *Illinois National Insurance Company*

### STATE AMENDATORY INCONSISTENT ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that in the
event that there is an inconsistency between a state amendatory attached to this policy
and any term or condition of this policy, then it is understood and agreed that, where
permitted by law, the **Insurer** shall apply those terms and conditions of either the
amendatory or the policy which are more favorable to the **Insured**.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.



_____

AUTHORIZED REPRESENTATIVE

◊ All rights reserved

**PI.App. 0067**

***END 016***

<u>ENDORSEMENT#</u> *17*

This endorsement, effective *12:01 am*      *June 1, 2016*          forms a part of
policy number *01-424-32-51*
issued to      *SOUTHWEST AIRLINES CO.*

by      *Illinois National Insurance Company*

## MODIFIED WRONGFUL COLLECTION COVERAGE ENDORSEMENT
### (SUBLIMIT)

**This endorsement amends the Security and Privacy Coverage Section.**

In consideration of the premium charged, it is hereby understood and agreed that in Clause
2. **DEFINITIONS** of the **Security and Privacy Coverage Section**, paragraph (l)  the definition
of " **Privacy Event**"  is amended  to include the  following  sentence  at  the  end thereof:

> " **Privacy Event**" also means the wrongful  collection of  **Confidential Information** by
> an **Insured** on or after the **Retroactive Date** and prior to the end of the **Policy Period.**

It is  further  understood  and agreed  that  the **Insurer's** maximum  liability  for  all  **Claims**
alleging wrongful collection of **Confidential Information**, as described above, is $5,000,000
(the " **Wrongful Collection Sublimit**").  The **Wrongful Collection Sublimit** is part of and not in
addition to the  **Limit of Liability**  and the **Sublimit  of Liability** for  the **Security  and Privacy
Coverage Section.**

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

<span style="color:red">Pl. App.0068</span>

_____
AUTHORIZED  REPRESENTATIVE

© All rights reserved.

MNSCPT                          ***END 17***

**ENDORSEMENT# *18***

This endorsement, effective *12:01 am*       *June 1, 2016*          forms a part of
policy number   *01-424-32-51*
issued to   *SOUTHWEST AIRLINES CO.*

by     *Illinois National Insurance Company*

**LOSS DEFINITION AMENDATORY ENDORSEMENT**

**This endorsement amends the Network Interruption Coverage Section.**

In consideration of the premium charged, it is hereby understood and agreed that the **Network Interruption Coverage Section** of the policy is amended as follows:

1. In clause 2. **DEFINITIONS**, the first paragraph of definition (e), the definition of " Loss"
   is amended to include the following at the end thereof:

   (3) costs to reroute or reschedule passenger travel that would not have been
   incurred but for a **Material Interruption.**

   (4) any civil fine or penalty imposed by the Department of Transportation or Federal
   Aviation Administration that would not have been incurred but for a **Material
   Interruption**, unless the civil fine or penalty imposed is uninsurable under the law of
   the jurisdiction imposing such fine or penalty. Solely with respect to the coverage
   afforded herein, the maximum liability of the **Insurer** from all **Loss** arising from any
   civil fine or penalty imposed by the Department of Transportation or Federal
   Aviation Administration arising from a **Material Interruption** shall be $2,000,000.

2. In Clause 3. **EXCLUSIONS**, the following paragraph shall be added at the end thereof:

   (k) civil or criminal fines or penalties imposed by law against an **Insured** and any
   matters deemed uninsurable under the law pursuant to which this policy shall be
   construed, provided, however, this sub-paragraph shall not apply to the above
   subparagraph (4) of definition (e) " **Loss**":

3. Solely with respect to the coverage afforded under this endorsement, Clause 2.
   **Definitions**, (f) "Material Interruption" of the **Network Interruption Coverage Section**
   is deleted and replaced with the following:

   (f) " **Material Interruption**" means the actual and measurable interruption or suspension
   of an **Insured's** business directly caused by a **Security Failure** or a **System Failure.**

ALL OTHER TERMS CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED

_____
AUTHORIZED REPRESENTATIVE

Pl. App. 0069
© All rights reserved.

ENDORSEMENT# *19*

This endorsement, effective *12:01 am*      *June 1, 2016*                forms a part of
policy number  *01-424-32-51*
issued to    *SOUTHWEST AIRLINES CO.*

by    *Illinois National Insurance Company*

SECURITY FAILURE DEFINITION  AMENDATORY  ENDORSEMENT

This endorsement amends the Security and Privacy Coverage Section
and the Event Management Coverage Section.

In consideration of the premium charged, it is hereby understood and agreed that the policy
is amended as follows:

1. In Clause 2. **DEFINITIONS**  of the **Security and  Privacy Coverage Section**, in  paragraph
   (p), the definition of  " **Security Failure**," the last sentence is deleted  in its entirety  and
   replaced with the following:

   " **Security Failure**" includes any such failure or violation, resulting from the theft of a
   password or access code.

2. In Clause 2. **DEFINITIONS** of the **Event Management Coverage Section**, in paragraph (l),
   the definition  of  " **Security Failure**", the  last  sentence is  deleted  in  its entirety  and
   replaced with the following:

   " **Security Failure**" includes any such failure or violation, resulting from the theft of a
   password or access code.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

Pl.App.0070
© All rights reserved.

MNSCPT                    *END 19*

ENDORSEMENT# *20*

This endorsement, effective *12:01 am*      *June 1, 2016*           forms a part of
policy number   *01-424-32-51*
issued to    *SOUTHWEST AIRLINES CO.*

by     *Illinois National Insurance Company*

### SECURITY THREAT DEFINITION AMENDATORY ENDORSEMENT

**This endorsement amends the Cyber Extortion Coverage Section.**

In consideration of the premium charged, it is hereby understood and agreed that the definition of " Security Threat" in paragraph 2(j) of the **Cyber Extortion Coverage Section**, is amended to include the following at the end thereof:

> " **Security Threat"** also means any threat or connected series of threats to the operation of cloud computing or other hosted resources supporting an **Insured** business by use of the **Insured's** administrative user credential without authorization, for the purpose of demanding money, securities or other tangible or intangible property of value from an **Insured**.

It is further understood and agreed that the **Insured** shall not waive any rights of the **Insurer** to seek recovery from a cloud or service provider where the unauthorized use of credentials was caused by such provider's error or a vulnerability in such provider's software.

ALL OTHER TERMS CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

PL App 0071
© All rights reserved.

MNSCPT                          *END 20*

ENDORSEMENT# 21

This endorsement, effective 12:01 am      June 1, 2016           forms a part of
policy number  01-424-32-51
issued to   SOUTHWEST AIRLINES CO.

by      Illinois National Insurance Company

## SYSTEM FAILURE COVERAGE ENDORSEMENT

This endorsement amends the Network Interruption Coverage Section.

## ENDORSEMENT SCHEDULE

| System Failure Sublimit | $10,000,000 |
|---|---|
| Outsource Provider Sublimit | $10,000,000 if arising out of a **Security Failure** |
| | $1,000,000 if arising out of a **System Failure** |

In consideration of the premium charged, it is hereby understood and agreed that the **Network Interruption Coverage Section** of the policy is amended as follows:

1. Clause 1. **INSURING AGREEMENTS** is deleted in its entirety and replaced with the following:

   1. **INSURING AGREEMENTS**

      With respect to the **NETWORK INTERRUPTION INSURING AGREEMENT** of this Clause 1., solely with respect to a **Security Failure** or **System Failure** first occurring during the **Policy Period** and reported to the **Insurer** pursuant to the terms of this policy, this **Network Interruption Coverage Section** affords the following coverage:

      **NETWORK INTERRUPTION INSURING AGREEMENT**

      The **Insurer** shall pay all **Loss** in excess of the **Remaining Retention** that an **Insured** incurs after the **Waiting Hours Period** and solely as a result of a **Security Failure** or a **System Failure**.

2. In Clause 2. **DEFINITIONS**, paragraph (f), the definition of " **Material Interruption**," is deleted in its entirety and replaced with the following:

   (f) " **Material Interruption**" means the actual and measurable interruption or suspension of an **Insured's** business directly caused by a **Security Failure** or a **System Failure**.

3. Solely with respect to the coverage afforded under this endorsement, in Clause 2. **DEFINITIONS**, paragraph (e), the definition of " **Loss**" is deleted in its entirety and replaced with the following:

Pl. App.0072

ENDORSEMENT# *21*     (Continued)

This endorsement, effective *12:01 am     June 1, 2016*              forms a part of
policy number  *01-424-32-51*
issued to    *SOUTHWEST AIRLINES CO.*

by      *Illinois National Insurance Company*

    (e) " **Loss**" means the below listed costs incurred within 120 days after the end of a **Material Interruption** (or 120 days after the **Material Interruption** would have ended if an **Insured** exercised due diligence and dispatch):

      (1) costs that would not have been incurred but for a **Material Interruption**; and

      (2)    the sum of all of following, which shall be calculated on an hourly basis:

         (a) Net Income (Net Profit or Loss before income taxes) that would have been earned; and
         (b) Continuing normal operating expenses incurred, including payroll; provided, however, such sum shall not exceed ten percent (10%) of the **System Failure Sublimit** during any one hour period and any amount in excess of ten percent (10%) of the **System Failure Sublimit** during any one hour period shall not be **Loss**.

    With respect to subparagraphs (1) and (2) above, **Loss** shall be reduced by any amounts recovered by an **Insured** (including, without limitation, the value of any service credits provided to an **Insured**) from any third party (including, without limitation, any **Outsource Provider**) in connection with or as a result of a **System Failure**.

4. In Clause 2. **DEFINITIONS**, paragraph (c), the definition of " **First Party Event**," is deleted in its entirety and replaced with the following:

    (c) " **First Party Event**" means any **Security Failure** or **System Failure**

5. Clause 2. **DEFINITIONS** is amended to include the following paragraphs at the end thereof:

    SF(a)  " **System Failure**" means any unintentional and unplanned outage of a **Computer System**.

    SF(b)  " **System Failure Sublimit**" means the amount stated in the Endorsement Schedule above.

6. In Clause 2. **DEFINITIONS**, paragraph (l), the definition of " **Waiting Hours Period**," is amended to include the following

<span style="color:red">Pl. App.0073</span>

MNSCPT                    *END 21*

<u>ENDORSEMENT# *21*</u>   (Continued)

This endorsement, effective  *12:01 am*     *June 1, 2016*            forms a part of
policy number  *01-424-32-51*
issued to    *SOUTHWEST AIRLINES CO.*

by    *Illinois National Insurance Company*

      With respect to the coverage afforded by this System Failure Coverage Endorsement for any **Material Interruption** resulting solely from a **System Failure**, the **Waiting Hours Period** shall equal twelve (12) hours and not the number of hours set forth in Item 6 of the Declarations.

7. In Clause 3. **EXCLUSIONS**, paragraph (g) is deleted in its entirety and replaced with the following:

      (g) alleging, arising out of, based upon or attributable to any **System Failure, Security Failure** or **Related Act** thereto which has been reported, or in any circumstances of which notice has been given, under any policy of which this **Network Interruption Coverage Section** is a renewal or replacement or which it may succeed in time.

8. In Clause 3. **EXCLUSIONS**, sub-paragraphs (i)(3) and (i)(5) are deleted in their entirety.

9. Clause 3. **EXCLUSIONS** is amended to include the following at the end thereof:

     The **Insurer** shall not be liable to make any payment for **Loss**:

     SF(a)  alleging, arising out of, based upon or attributable to any electrical or mechanical failure of infrastructure, other than a **Computer System** and regardless of whether or not it is controlled by an **Insured**, including any electrical power interruption, surge, brownout or blackout.

     SF(b)  alleging, arising out of, based upon or attributable to contractual penalties or consequential damages.

     SF(c)  for the cost of (1) updating, upgrading, enhancing or replacing any **Computer System** to a level beyond that which existed prior to sustaining **Loss**; or (2) removing software program errors or vulnerabilities.

10. Clause 4. **LIMIT OF LIABILITY** is deleted in its entirety and replaced with the following:

   **4. LIMIT OF LIABILITY**

     The following provisions shall apply in addition to the provisions of Clause 4. **LIMIT OF LIABILITY** of the **General Terms and Conditions**:

     Notwithstanding anything in the policy to the contrary:

<span style="color:red">Pl. App.0074</span>

MNSCPT                                 *END 21*

<u>ENDORSEMENT#</u> *21*     (Continued)

This endorsement, effective *12:01 am*     *June 1, 2016*          forms a part of
policy number   *01-424-32-51*
issued to     *SOUTHWEST AIRLINES CO.*

by     *Illinois National Insurance Company*

    (a) the maximum liability of the **Insurer** for all **Loss** arising from all **System Failures**
        is the **System Failure Sublimit** set forth in the Endorsement Schedule above.
        The **System Failure Sublimit** is part of, and not in addition to, the **Limit of
        Liability** and the **Sublimit of Liability** for the **Network Interruption Coverage
        Section;** and

    (b) the maximum liability of the **Insurer** for all **Loss** arising from a **Security Failure**
        of the **Computer System** of an **Outsource Provider** shall be  $10,000,000.  This
        amount shall be part of and not in addition to the **Limit of Liability** and any
        applicable **Sublimit of Liability.**

    (c) the maximum liability of the **Insurer** for all **Loss** arising from a **System Failure** of
        the **Computer System** of an **Outsource Provider** shall be $1,000,000.    This
        amount shall be part of and not in addition to the **Limit of Liability** and any
        applicable **Sublimit of Liability.**

11. Clause **7. NET PROFIT CALCULATIONS** is deleted in its entirety and replaced with the
    following:

    **7.  NET PROFIT CALCULATIONS**

      In determining the amount of net profit (or net loss) and charges and expenses
      covered hereunder for the purpose of ascertaining the amount of **Loss** (and
      otherwise) under this **Network Interruption Coverage Section,** due consideration
      shall be given to the prior experience of an **Insured's** business before the beginning
      of the **Security Failure** or **System Failure** and to the probable business an **Insured**
      could have performed had no **Security Failure** or **System Failure** occurred. Provided,
      however, that such net profit (or net loss) calculations shall not include, and this
      policy shall not cover, net income that would likely have been earned as a result of
      an increase in volume of business due to favorable business conditions caused by
      the impact of **Security Failures** or **System Failures** on other businesses. All such net
      profit (or net loss) and charges and expenses shall be calculated on an hourly basis
      and based on such an **Insured's** actual net profit (or net loss) and charges and
      expenses.

ALL OTHER TERMS CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED

_____
AUTHORIZED REPRESENTATIVE

PL App 0075
© All rights reserved.

ENDORSEMENT# *22*

This endorsement, effective *12:01 am*      *June 1, 2016*                forms a part of
policy number   *01-424-32-51*
issued to *SOUTHWEST AIRLINES CO.*

by     *Illinois National Insurance Company*

FORMS INDEX ENDORSEMENT

The contents of the Policy is comprised of the following forms:

| FORM NUMBER | EDITION DATE | FORM TITLE |
| --- | --- | --- |
| 101012 | 12/13 | SRP - DECLARATIONS (COUNTRYWIDE) |
| 101013 | 12/13 | SRP GENERAL TERMS AND CONDITIONS (COUNTRYWIDE) (12/13) |
| 101017 | 12/13 | CYBER EXTORTION COVERAGE SECTION (12/13) |
| 101018 | 12/13 | EVENT MANAGEMENT COVERAGE SECTION (12/13) |
| 101024 | 12/13 | SECURITY AND PRIVACY COVERAGE SECTION (12/13) |
| 101021 | 12/13 | NETWORK INTERRUPTION COVERAGE SECTION (12/13) |
| 101019 | 12/13 | MEDIA CONTENT COVERAGE SECTION (CLAIMS MADE) (12/13) |
| 119679 | 09/15 | ECONOMIC SANCTIONS ENDORSEMENT |
| 110646 | 05/14 | TEXAS AMENDATORY ENDORSEMENT |
| 74802 | 07/11 | TEXAS CANCELLATION/NONRENEWAL ENDORSEMENT |
| 113428 | 02/14 | CYBEREDGE LOSS PREVENTION SERVICES ENDORSEMENT |
| 101036 | 04/09 | CANCELLATION AMENDATORY |
| 103452 | 11/09 | CHOICE OF PANEL COUNSEL ENDORSEMENT |
| 111375 | 07/12 | CONDUCT EXCLUSION AMENDATORY ENDORSEMENT |
| 115985 | 12/13 | CONTROL GROUP DEFINITION AMENDATORY ENDORSEMENT |
| 105567 | 05/10 | CRIMINAL REWARD COVERAGE EXTENSION |
| 117895 | 05/14 | CYBERTERRORISM COVERAGE ENDORSEMENT |
| 107376 | 11/10 | E-DISCOVERY CONSULTANT SERVICES COVERAGE ENDORSEMENT |
| 118110 | 08/14 | EVENT MANAGEMENT SCHEDULED VENDOR ENDORSEMENT |
| 103456 | 11/09 | NOTICE OF CLAIM PROVISION AMENDATORY ENDORSEMENT (SIXTY DAY POST POLICY REPORTING PERIOD) |
| 105565 | 05/10 | RETENTION AMENDATORY ENDORSEMENT |
| 115989 | 12/13 | SECURITY FAILURE DEFINITION AMENDATORY ENDORSEMENT (PHYSICAL THEFT OF HARDWARE) |

Pl. App.0076
© All rights reserved.

*END 022*

ENDORSEMENT# *22*

This endorsement, effective *12:01 am*   *June 1, 2016*                    forms a part of
policy number   *01-424-32-51*
issued to *SOUTHWEST AIRLINES CO.*

by   *Illinois National Insurance Company*

FORMS INDEX ENDORSEMENT

The contents of the Policy is comprised of the following forms:

| FORM NUMBER | EDITION DATE | FORM TITLE |
|---|---|---|
| 105165 | 04/10 | STATE AMENDATORY INCONSISTENT ENDORSEMENT |
| MNSCPT | | MODIFIED WRONGFUL COLLECTION COVERAGE ENDORSEMENT |
| MNSCPT | | LOSS DEFINITION AMENDATORY ENDORSEMENT |
| MNSCPT | | SECURITY FAILURE DEFINITION  AMENDATORY  ENDORSEMENT |
| MNSCPT | | SECURITY THREAT DEFINITION AMENDATORY ENDORSEMENT |
| MNSCPT | | SYSTEM FAILURE COVERAGE ENDORSEMENT |
| 78859 | 10/01 | FORMS INDEX ENDORSEMENT |
| 53365 | 07/96 | TEXAS NOTICE - LOSS CONTROL |
| 94396 | 05/15 | TEXAS COMPLAINT NOTICE FOR ADMITTED PAPER CO. |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

Pl. App.0077

*END 022*

**NOTICE TO POLICYHOLDER OF**

*Illinois National Insurance Company*

---

This notice is to inform you of our loss control programs available in the State of Texas.

We have Field Safety Representatives with the experience and expertise to provide accident/loss prevention services reasonably commensurate with the hazard, loss experience, size and nature of your business operation.

Our services may include loss prevention surveys, risk exposure analysis, staff training, counseling, accident and loss analysis, worker health and safety evaluations, risk improvement recommendations, educational material and literature related to your specific profession or industry.

In the event you decide not to utilize our loss control services and opt to use your own safety department or hire an outside contractor, the service must be provided by qualified loss prevention representatives who are recognized by the State of Texas.

If you elect not to utilize our loss control services we require you to provide us with the following information (on your company letterhead stationery, signed by an officer of your firm):

- Acknowledgement of our offer of loss control services and your written rejection.

- Your reasons for selection of an alternative.

- Your alternative loss control program, which must be reasonably commensurate with the risk.

- Verification of the qualification of those who will be performing your loss control services.

- Acknowledgement that quarterly summaries of activities outlined in your loss control program will be submitted to us for review.

If you have any questions or wish to discuss this matter, contact our Texas Loss Control Service Coordinating Unit, at 1-800-221-0651.

<p style="text-align:center; color:red;">Pl. App.0078</p>

TEXAS NOTICE

## IMPORTANT NOTICE

To obtain information or make a complaint:

You may call the Company's toll-free telephone number for information or to make a complaint at:

1-877-541-9748

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights, or complaints at:

1-800-252-3439

You may write the Texas Department of Insurance:

P.O. Box 149104
Austin, TX  78714-9104
Fax:    (512) 490-1007

Web:    http://www.tdi.texas.gov

E-mail: ConsumerProtection@tdi.texas.gov

**PREMIUM OR CLAIM DISPUTES:**
Should you have a dispute concerning your premium or about a claim, you should contact the agent first.  If the dispute is not resolved, you may contact the Texas Department of Insurance.

**ATTACH THIS NOTICE TO YOUR POLICY:**
This notice is for information only and does not become a part of the attached document.

## AVISO IMPORTANTE

Para obtener información o para presentar una queja:

Usted puede llamar al número de teléfono gratuito de la compania para obtener información o para presentar una queja al:

1-877-541-9748

Usted puede comunicarse con el Departamento de Seguros de Texas para obtener información sobre companias, coberturas, derechos, o quejas al:

1-800-252-3439

Usted puede escribir al Departamento de Seguros de Texas a:

P.O. Box 149104
Austin, TX  78714-9104
Fax:    (512) 490-1007

Sitio web:  http://www.tdi.texas.gov

E-mail: ConsumerProtection@tdi.texas.gov

**DISPUTAS POR PRIMAS DE SEGUROS O RECLAMACIONES:**
Si tiene una disputa relacionada con su prima de seguro o con una reclamación, usted debe comunicarse con el agente primero.  Si la disputa no es resuelta, usted puede comunicarse con el Departamento de Seguros de Texas.

**ADJUNTE ESTE AVISO A SU PÓLIZA:**
Este aviso es solamente para propósitos informativos y no se convierte en parte o en condición del documento adjunto.

Pl. App.0079

94396 (5/15)



## CLAIM REPORTING FORM

Issuing Company: *Illinois National Insurance Company*

Reported under Policy/Bond Number: *01-424-32-51*     Date: _____

Type of Coverage: D&O _____ E&O _____ Fidelity _____ (complete the Fidelity Supplemental on the next page)

Insured's Name, as given on Policy Declarations (Face Page):

*SOUTHWEST AIRLINES CO.* _____

_____

_____

Contact Person: _____

Title: _____

Phone: _(_____)_____-_____Ext_____

eMail: _____@_____

Case or Claimant Name: _____

_____

If the party involved is different from "Insured" Name (as given on Policy Declarations) state relationship:

_____

Insurance Broker/Agent: *WOODRUFF-SAWYER & CO*

Address: *50 CALIFORNIA STREET, FLOOR 12*

Address: *SAN FRANCISCO, CA 94111*

Contact: *LAURI FLORESCA*     Phone:_____

eMail: *CARRIERDOCS@WSANDCO.COM*

Send Notice of Claims to:    AIG            Phone: (888) 602-5246
                            Financial Lines Claims    Fax:     (866) 227-1750
                            P.O. Box 25947        Email: c-Claim@AIG.com
                            Shawnee Mission, KS 66225

Pl. App.0080



## CLAIM REPORTING FORM
## FIDELITY SUPPLEMENTAL
**(Only complete this supplemental if the Claim is being reported under Fidelity Coverage)**

Issuing Company: *Illinois National Insurance Company*

Reported under Policy/Bond Number:  *01-424-32-51*

Date of Discovery: ————————   Estimated Amount of loss: ————————

Cause of Loss:   Employee Dishonesty   ————    Computer Fraud      ————

Funds Transfer   ————    Robbery/Burglary   ————

ID Theft    ————    Forgery      ————

Client Property   ————    In Transit     ————

ERISA     ————    Credit Card Forgery  ————

Other     ————    if Other, describe: ————————

Send Notice Of Claims To:   AIG     Phone:  (888) 602-5246
Financial Lines Claims   Fax:   (866) 227-1750
P.O. Box 25947    Email:  c-Claim@AIG.com
Shawnee Mission, KS 66225

## Pl. App.0081

*centralized Customer Link and Information Management*

Pl. App.0082

# Exhibit B

Pl. App.0083



# LIBERTY INSURANCE UNDERWRITERS INC.

# MANAGEMENT LIABILITY AND PROFESSIONAL LIABILITY FOLLOW FORM EXCESS

In Witness Whereof, we have caused this policy to be signed by its President and Secretary.

PRESIDENT
Christopher L. Peirce

VICE PRESIDENT and SECRETARY
Mark C. Touhey

Pl. App.0084

LIUIPOLJKT Ed. 2012

Liberty Insurance Underwriters Inc.
55 Water Street, New York, NY 10041   Toll-free number: 1-800-677-9163

**Management Liability and Professional
Liability Follow Form Excess**



## LIBERTY INSURANCE UNDERWRITERS INC.

(A Stock Insurance Company, hereinafter the "Insurer")
55 Water Street, 23rd Fl, New York, NY  10041
Toll-Free number: 1-800-677-9163

### POLICY DECLARATIONS

|  |  | **Policy Number:**  **EO4NAAY4YC003** |
|---|---|---|
| **ITEM 1.** | **NAMED INSURED:** | Southwest Airlines |
| **ITEM 2.** | **PRINCIPAL ADDRESS:** | 2702 Love Field Drive<br>P.O. Box 36611<br>Dallas, Tx  75235 |

**ITEM 3.**   **LIMIT OF LIABILITY:**

Each Policy Period   $10,000,000 Per Claim / $10,000,000 Aggregate Excess Of
$50,000,000 Per Claim / $50,000,000 Aggregate

**ITEM 4.**   **UNDERLYING POLICIES:**

(A)   **Primary Policy:**

| Insurer: | Illinois National Insurance Company |
|---|---|
| Policy Number: | 01-424-32-51 |
| Limits: | $10,000,000 |
| Deductible: | $2,500,000 |
| Policy Period: | June 1, 2016 to June 1, 2017 |

(B)   **Other Policy(ies):**

| Insurer: | Principia Underwriting |
|---|---|
| Policy Number: | B0146CYUSA1600486 |
| Limits: | $20,000,000 |
| Excess of: | $10,000,000 |
| Policy Period: | June 1, 2016 to June 1, 2017 |

| Insurer: | Steadfast Insurance Company |
|---|---|
| Policy Number: | SPR 9155553-02 |
| Limits: | $10,000,000 |
| Excess of: | $30,000,000 |
| Policy Period: | June 1, 2016 to June 1, 2017 |

| Insurer: | Greenwich Insurance Company |
|---|---|
| Policy Number: | MTE903084802 |
| Limits: | $10,000,000 |
| Excess of: | $40,000,000 |
| Policy Period: | June 1, 2016 to June 1, 2017 |

**ITEM 5.**   **POLICY PERIOD:**

From: 12:01 a.m. on June 1, 2016
To: 12:01 a.m. on June 1, 2017
Local time at the address shown in Item 2.

<span style="color:red">Pl. App.0085</span>

| 1 | 2 |
|---|---|

PL-EFF-Dec-0312

**Management Liability and Professional
Liability Follow Form Excess**



| ITEM 6. | ENDORSEMENT(S) EFFECTIVE AT INCEPTION: | |
|---|---|---|
| | See Schedule of Endorsements | |
| ITEM 7. | TERMINATION OF PRIOR POLICY(IES): | EO4NAAY4YC002 |
| ITEM 8. | PREMIUM: | $199,000 |

In witness whereof, the Insurer has caused this policy to be signed by its President and its Secretary at Boston, Massachusetts, and countersigned below by a duly authorized representative.

PRESIDENT
Christopher L. Peirce

VICE PRESIDENT and SECRETARY
Mark C. Touhey

Pl. App.0086

2   2

PL-EFF-Dec-0312

**Management Liability and Professional
Liability Follow Form Excess**



## LIBERTY INSURANCE UNDERWRITERS INC.

(A Stock Insurance Company, hereinafter the "Insurer")
55 Water Street, 23rd Fl, New York, NY 10041
Toll-Free number: 1-800-677-9163

### POLICY TERMS

Relying upon the completeness and accuracy of the statements and disclosures in the application for this Policy and upon all other information provided to the **Insurer**, in consideration of the payment of the premium of this Policy, the **Insurer** agrees as follows:

1. **Incorporation of Primary Policy**: This Policy incorporates by reference the insuring clauses, warranties, definitions, terms, conditions, exclusions and other provisions contained in the **Primary Policy** and as described in the materials submitted to the **Insurer** in connection with the application for this Policy except as regards the premium, the limit of liability, the policy period, and except as otherwise provided herein. Any changes to the **Primary Policy** shall not be binding on the **Insurer** unless specifically endorsed hereon.

2. **Definitions**: The following terms, whenever printed in **boldface** type in this Policy, shall have the meanings indicated below.

   2.1  **"Insurer"** means the entity issuing this Policy as named on the Declarations.

   2.2  **"Named Insured"** means the entity identified in Item 1 of the Declarations.

   2.3  **"Primary Policy"** means the policy identified in Item 4.(A) of the Declarations.

   2.4  **"Underlying Limit of Liability"** means the combined limits of liability of the **Underlying Policies**, less any reduction or exhaustion of the limits of liability due to payment of loss under those policies.

   2.5  **"Underlying Policies"** means the policies identified in Items 4.(A) and 4.(B) of the Declarations.

3. **Limit of Liability**: The **Insurer** will pay 100 percent of loss in excess of both the **Underlying Limit of Liability** plus the applicable retention or deductible under the **Primary Policy**, up to the Limit of Liability stated in Item 3 of the Declarations. The **Insurer's** maximum liability under this Policy for loss shall be the amount shown in Item 3 of the Declarations. In the event the Limit of Liability stated in Item 3 of the Declarations is exhausted by payment of loss, any and all obligations of the **Insurer**, hereunder, shall be deemed to be completely fulfilled and extinguished.

4. **Maintenance of Underlying Policies**: It is a condition precedent to the coverage afforded under this Policy that the Insureds maintain the **Underlying Policies** with retentions/deductibles, participation/co-insurance and limits of liability (subject to reduction or exhaustion as a result of loss payments), as set forth in Items 4.(A) and 4.(B) of the Declarations.

   Except as provided in paragraph 4.1., this Policy only provides coverage when the **Underlying Limit of Liability** is exhausted by reason of the Insurers of the **Underlying Policies** paying or being held liable to pay, in legal currency, the full amount of the **Underlying Limit of Liability** as a loss.

   4.1  In the event that one or more of the insurers under the **Underlying Policies** fails to pay a loss in connection with any claim covered under the **Underlying Policies** as a result of the insolvency, bankruptcy or liquidation of said insurer, then the Insureds shall be deemed self-insured for the amount of the limit of liability of said insurer which is not paid as a result of such insolvency, bankruptcy or liquidation.

5. **Reduction or Exhaustion**: In the event of the reduction of the **Underlying Limits of Liability** by reason of payment of loss, this Policy shall pay excess of the reduced limits. In the event of exhaustion of the **Underlying Policies**, this Policy shall continue in force as primary insurance. However, this Policy shall only pay excess of the

Pl. App.0087

## Management Liability and Professional Liability Follow Form Excess



retention or deductible applicable to the **Primary Policy**, which shall be applied to any subsequent loss in the same manner as specified in the **Primary Policy**.

5.1   If any **Underlying Policies** bear an effective date which is prior to the Policy inception date, and any such insurance becomes exhausted or impaired by payment of loss, with respect to any claim which shall be deemed to be made prior to the Policy inception date, then with respect to any claim made after the Policy inception date, the insureds shall be deemed to be self-insured for the amount of any such **Underlying Policies** which are exhausted or impaired by payment of such loss with respect to such claim made prior to the Policy inception date.

6.   **Defense and Settlement:** The Insureds shall not admit liability for, offer to settle, settle any claim or incur costs of defense, where the liability, settlement and/or costs of defense are reasonably likely to involve the limit of liability of this Policy, without the **Insurer's** prior written consent, which consent shall not be unreasonably withheld.

7.   **Notice of Claim:** The Insureds shall give the **Insurer** notice of any claim in the same manner required by the terms and conditions of the **Primary Policy** and shall give the **Insurer** such information and cooperation as it may reasonably require. Notices to the **Insurer** shall be sent via express mail to:

Liberty International Underwriters, Inc.
55 Water Street
23rd Floor
New York, NY 10041

Such notice shall be effective on the date of receipt by the **Insurer** at the above address.

8.   **Policy Termination:** This Policy may be cancelled in the same manner as provided by the terms and conditions of the **Primary Policy**.

9.   **Subrogation:** If any payment is made hereunder, the **Insurer** will act in concert with all other interests concerned (including those of the Insureds) in the exercise of rights of recovery against any person or other entity. If any amounts are recovered, they shall be apportioned as follows:

a.   Any interests (including those of the Insureds) that paid an amount by or on behalf of the Insureds over and above any payment made by the **Insurer** under this Policy shall be reimbursed first up to the amount paid by them;

b.   then, the **Insurer** shall be reimbursed out of any balance remaining, up to the amount paid, and;

c.   then, the interests (including those of the Insureds) of which this coverage is in excess are entitled to claim the residual, if any.

10.   **Assignment:** Assignment of interest under this Policy shall not bind the **Insurer** unless its consent is endorsed hereon.

11.   **Conformity to Statute:** Any terms of this Policy which are in conflict with the terms of any applicable laws construing this Policy are hereby amended to conform to such laws.

12.   **Entire Agreement:** By acceptance of this Policy, the Insureds and the **Insurer** agree that this Policy, including the Declarations, the application and any written endorsements attached hereto, constitute the entire agreement between the parties.

13.   **Representation by the Named Insured:** The **Named Insured** shall act on behalf of all the Insureds for all purposes including, but not limited to, the negotiation and purchase of this Policy, the giving and receiving of all notices and correspondence, the cancellation or nonrenewal of this Policy, the payment of premiums, and the receipt of any return premiums that may be due under this Policy.

Pl. App.0088

**Management Liability and Professional
Liability Follow Form Excess**



14. **Mutual Policy Conditions:** This Policy is nonassessable. The **Named Insured** is a member of the **Insurer's** company and shall participate to the extent and upon the conditions fixed and determined by the board of directors in accordance with the provisions of law, in the distribution of dividends so fixed and determined.

In Witness Whereof, the **Insurer** has caused this Policy to be executed and attested, but this Policy shall not be valid unless countersigned on the Declarations Page by a duly authorized agent of the **Insurer.**

PRESIDENT
Christopher L. Peirce

VICE PRESIDENT and SECRETARY
Mark C. Touhey

Pl. App.0089

**Management Liability and Professional
Liability Follow Form Excess**



## LIBERTY INSURANCE UNDERWRITERS INC.
(A Stock Insurance Company, hereinafter the "Insurer")

### SCHEDULE OF ENDORSEMENTS

| Endorsement No. | Form Name | Form Number |
|---|---|---|
| | Declarations Page | PL-EFF-Dec-0312 |
| | Excess Policy Form | EFF-POL-0410 |
| | Texas Notice | LIUNOTICE002-TX-0410 |
| 1 | Non Follow Form of Underlying Coverages | EFF-E065-1011 |
| 2 | Recognition of Underlying Payment by Insured | EFF-E071-0511 |
| 3 | Drop Down over Sublimit Endorsement | MAN.1 EFF-E063-0815 |
| 4 | U.S. Economic and Trade Sanctions Clause | OFAC 08/09 |

Pl. App.0090

# Texas Important Notice

To obtain information or make a complaint:

You may call Liberty Insurance Underwriters toll-free telephone number for information or to make a complaint at:

**1-800-677-9163**

You may also write to Liberty Insurance Underwriters Inc at:

Liberty International Underwriters Inc
55 Water Street, 23rd Fl
New York, NY 10041

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at:

**1-800-252-3439**

You may write the Texas Department of Insurance at:

Texas Department of Insurance
PO Box 149104
Austin TX 78714-9104
Fax # (512) 475-1771
Web: http://www.tdi.state.tx.us
E-mail: ConsumerProtection@tdi.state.tx.us

**PREMIUM OR CLAIM DISPUTES:**

Should you have a dispute concerning your premium or about a claim you should contact the agent or the company first. If the dispute is not resolved, you may contact the Texas Department of Insurance.

**ATTACH THIS NOTICE TO YOUR POLICY:**

This notice is for information only and does not become a part or condition of the attached document.

Pl. App.0091

**Management Liability and Professional**
**Liability Follow Form Excess**



## LIBERTY INSURANCE UNDERWRITERS INC.

(A Stock Insurance Company, hereinafter the "Insurer")

ENDORSEMENT NO. 1

| | |
|---|---|
| **Effective Date:** | June 1, 2016 |
| **Policy Number:** | EO4NAAY4YC003 |
| **Issued To:** | Southwest Airlines |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**NON-FOLLOW FORM OF UNDERLYING INSURANCE BUT RECOGNITION OF
UNDERLYING EROSION ENDORSEMENT**

In consideration of the premium charged, it is hereby agreed that:

1) This Policy shall not:

   a) provide coverage pursuant to; or

   b) follow form the **Underlying Policies** to the extent such insurance provide
      coverage for:

      -- DOT/FAA Fines Sublimit

2) No coverage will be available under this Policy for claims which are subject to the coverages listed in number 1)
   above in any **Underlying Policies**; provided that the erosion of the aggregate Limits of Liability of such
   **Underlying Policies** shall be recognized to the extent of any payment of loss in connection with such claims.

All other terms, conditions and exclusions of this Policy remain unchanged.

<span style="color:red">Pl. App.0092</span>

EFF-E065-1011

**Management Liability and Professional
Liability Follow Form Excess**



## LIBERTY INSURANCE UNDERWRITERS INC.
(A Stock Insurance Company, hereinafter the "Insurer")

ENDORSEMENT NO. 2

| | |
|---|---|
| **Effective Date:** | June 1, 2016 |
| **Policy Number:** | EO4NAAY4YC003 |
| **Issued To:** | Southwest Airlines |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### RECOGNITION OF UNDERLYING PAYMENT ENDORSEMENT

In consideration of the premium charged, it is hereby agreed that this Policy is amended as follows:

Paragraph 4 of this Policy is deleted in its entirety and replaced with the following:

4. Maintenance of Underlying Policies: The insureds shall maintain the **Underlying Policies** with retentions/deductibles, participation/co-insurance and limits of liability (subject to reduction or exhaustion as a result of loss payments), as set forth in **Items 4.**(A) and 4.(B) of the Declarations. Except as provided in paragraph 4.1, this Policy only provides coverage when the **Underlying Limit of Liability** is exhausted by reason of the **insurers** of the **Underlying Policies** or the insureds paying or being held liable to pay in legal currency the full amount of the **Underlying Limit of Liability** as loss. However, if the **Underlying Policies** are not so maintained, the **Insurer** shall not be liable under this Policy to a greater extent than it would have been had such **Underlying Policies** been so maintained.

As a condition precedent to any such payment by the insured toward exhaustion of the **Underlying Policies**, the insured must promptly notify the **Insurer** and obtain the **Insurer's** prior written consent. In no way shall such payment by the insured constitute a waiver of any terms, conditions or exclusion of the **Underlying Policies** or this Policy.

The **Insurer's** maximum liability for loss under this Policy shall be the amount set forth in **Item 3** of the Declarations. However, if the insureds have (for any reason other than the financial impairment or insolvency of an **insurer** of the **Underlying Policies**) made any payment of loss, that would otherwise be covered under this Policy, and such payment has contributed to the exhaustion of an **Underlying Policy**, the limit of liability of this Policy shall be reduced by the highest percentage by which any **Underlying Policies** were reduced as a result of such payment and the insureds shall bear such percentage amount uninsured.

4.1 In the event one or more of the insurers under the **Underlying Policies** fails to pay loss in connection with any claim covered under the **Underlying Policies**; as a result of the insolvency, bankruptcy or liquidation of said insurer, then the insureds shall be deemed self-insured for the amount of the limit of liability of said insurer which is not paid as a result of such insolvency, bankruptcy or liquidation.

All other terms, conditions, and exclusions of this Policy remain unchanged.

Pl. App.0093

**Management Liability and Professional
Liability Follow Form Excess**



## LIBERTY INSURANCE UNDERWRITERS INC.

(A Stock Insurance Company, hereinafter the "Insurer")

ENDORSEMENT NO. 3

| | |
|---|---|
| **Effective Date:** | June 1, 2016 |
| **Policy Number:** | EO4NAAY4YC003 |
| **Issued To:** | Southwest Airlines |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

### DROP DOWN OVER SUBLIMIT ENDORSEMENT

In consideration of the premium charged, it is hereby agreed that, upon exhaustion of the following Sub-Limits as described in the **Primary Policy**

| Sub-Limit | Sub-Limited Coverage |
|---|---|
| $1,000,000 | System Failure of an Outsource Provider |
| $5,000,000 | Wrongfull Collection |

and any such applicable Sub-Limit on any **Underlying Policies,** this Policy shall drop down and follow form to the terms, conditions and limitations of such coverage; provided that the **Insurer's** aggregate limit of liability applicable to such coverage shall be

| Sub-Limit | Sub-Limited Coverage |
|---|---|
| $1,000,000 xs $5,000,000 | System Failure of an Outsource Provider |
| $5,000,000 xs $25,000,000 | Wrongfull Collection |

which shall be part of and not in addition to the Insurer's aggregate limit of liability set forth in Item 3. of the Declarations.

All Other Terms And Conditions Of This Policy Remain Unchanged.

**Pl. App.0094**

**Management Liability and Professional
Liability Follow Form Excess**



## LIBERTY INSURANCE UNDERWRITERS INC.

(A Stock Insurance Company, hereinafter the "Insurer")

ENDORSEMENT NO. 4

| | |
|---|---|
| **Effective Date:** | June 1, 2016 |
| **Policy Number:** | EO4NAAY4YC003 |
| **Issued To:** | Southwest Airlines |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### U.S. ECONOMIC AND TRADE SANCTIONS CLAUSE

Whenever coverage provided by this policy would be in violation of any U.S. economic or trade sanctions such as, but not limited to, those sanctions administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), such coverage shall be null and void. Similarly, any coverage relating to or referred to in any certificates or other evidences of insurance or any claim that would be in violation of U.S. economic or trade sanctions as described above shall also be null and void.

Pl. App.0095